In the Matter of HIPP, INC., Debtor.

**Thomas J. GRIFFITH,
Trustee, Appellee,**

v.

**David OLES, Appellant.**

**No. 88–1663.**

United States Court of Appeals,
Fifth Circuit.

March 16, 1990.

Rehearing Denied April 18, 1990.

Kent Frank Brooks, Linda N. Coffee, Dallas, Tex., for appellant.

Floyd Holder, Jr., Lubbock, Tex., for appellee.

Before KING, GARWOOD, and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

This case presents important issues respecting bankruptcy court criminal contempt proceedings and powers.

Following an evidentiary hearing held pursuant to a show cause order issued on motion of the trustee of a Chapter 11 debtor, the bankruptcy court entered an order dated April 8, 1988 convicting defendant-appellant David Oles (Oles) of criminal contempt, 18 U.S.C. § 401(3), for filing five *lis pendens* notices respecting property of the estate in violation of a November 9, 1987 order of that court, and sentenced him to five concurrent terms of six months' confinement and five cumulative $500 fines.[1] Oles filed objections to the April 8 order as

provided in Bankruptcy Rules 9020 and 9033. Pursuant to these rules, the district court thereafter reviewed the bankruptcy court's April 8 order *de novo*, though solely on the basis of the record, the transcript of the bankruptcy court contempt hearing, and the written objections and briefs, and without any further hearing of any kind or any additional evidence. The district court's action on such review is reflected only in its August 26, 1988 fifty-three page "Memorandum Opinion and Contempt Order." This document recites that the bankruptcy court's "contempt order is presently before this Court for de novo review"[2]; makes findings of fact and conclusions of law in substance as found by the bankruptcy court in its April 8 order; rejects all of Oles' objections to the bankruptcy court's April 8 order except respecting the sentence thereby imposed, as to which it recites that "[t]he fines imposed are hereby vacated"[3]; and concludes by adjudging Oles to have committed willful contempt of the bankruptcy court on the same five occasions as determined in the bankruptcy court's April 8 order and by sentencing him to five concurrent six-month terms of imprisonment.[4]

Oles then filed a timely notice of appeal.[5]

Because this criminal contempt was prosecuted by the bankruptcy trustee (and his attorney), rather than a disinterested repre-

---

1. This order states that: "The sentence is to commence ten days after this Order becomes final.... The Order shall be final ten days after service unless within the ten day period David Oles ... files ... objection prepared in the manner provided by Bankruptcy Rule 9033(b). If timely objection is filed, this Order shall be reviewed as provided in Bankruptcy Rule 9033."

2. The opinion-order's opening paragraph states in full:

"Before the Court is an order entered by United States Bankruptcy Judge John C. Akard holding David Oles in criminal contempt of court. Oles, as contemnor, timely filed written objections to this order pursuant to Bankruptcy Rule 9020. Accordingly, the contempt order is presently before this Court for de novo review."

3. The opinion-order also states in this connection, "Because this Court has the authority to revise the contempt sentence issued by the

bankruptcy court it is not necessary to remand for resentencing."

4. The August 26 opinion-order recites in its conclusion:

"This Memorandum Opinion and Order is a final order holding David Oles in contempt of court. David Oles is adjudged to have committed willful contempt of the bankruptcy court on five separate occasions as set out in this Court's Findings of Fact.

"The penalty assessed by the Bankruptcy Judge is hereby modified and is assessed as follows:"

There follows a recital of each of the five occasions, stating after each, "and for this offense it is ORDERED that David Oles be confined for six months"; and after the last occasion, "[i]t is further ORDERED that the five sentences for contempt shall run concurrently."

5. He has remained on $5,000 personal appearance bond pending appeal.

sentative of the United States, we reverse Oles' conviction and sentence and remand to the district court for further proceedings. *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987). We further hold that the trial and determination of criminal contempt, at least one such as this which is of the kind governed by 18 U.S.C. § 401(3) and Fed.R.Crim.P. 42(b), must be before and by the district court and not the bankruptcy court.

To put our holdings in context, we initially summarize the history of these proceedings.

### Facts and Proceedings Below

On April 4, 1984, Hipp, Inc. (Hipp) filed under Chapter 11 in the bankruptcy court. Thomas J. Griffith (Griffith) was appointed trustee. On October 2, 1987, Griffith filed an adversary proceeding against Phoenix Grain, Oles, and Redonda Cotter for turnover of property to the Hipp estate and for damages. In the bankruptcy, Griffith gave notice of his intent to sell all the estate's real and personal property in Swisher and Castro Counties free and clear of liens. At a hearing on this notice, at which Oles was represented by counsel, the bankruptcy court entered an order on October 16 allowing Griffith to go forward with the sale. The court found that Oles was not a credi-

tor of the Hipp estate and did not hold a lien on its property.

On November 3, 1987, in a separate action against Oles and others, Griffith asked the bankruptcy court to order Oles and others to withdraw *lis pendens* notices filed against the Hipp estate property on August 20, 1987 and October 22, 1987. On November 9, the bankruptcy court held a hearing on this motion and also on Griffith's complaint. During that hearing, the court orally ordered Oles and others to withdraw all such notices of *lis pendens* by noon, November 12, and, according to the bankruptcy court's findings in its April 8, 1988 order, to file no further *lis pendens* notices on the properties.[6]

On February 9, 1988, Griffith filed with the bankruptcy court in the Hipp bankruptcy a "Motion to Avoid Notice Lis Pendens and for Contempt of Court" against Oles, alleging that he had filed three *lis pendens* notices on November 13, 1987 in Swisher County, and also similar notices in Castro County, and had on January 14, 1988 filed such a notice in Swisher County, all as to Hipp estate property. The bankruptcy court entered an order on March 23, 1988, directing Oles to show cause on April 5 why he should not be held in contempt "as sought by" Griffith. At the conclusion of the hearing on the contempt motion conducted before the bankruptcy court on April 5, 1988, after Oles had filed his re-

---

**6.** No transcript of the bankruptcy court's oral order of November 9 (or of any other portion of the November 9 hearing) was placed in evidence at the contempt hearing before the bankruptcy court, nor was any such included in the record when the district court entered its August 28, 1988 opinion-order. The same bankruptcy judge who presided at the November 9 hearing likewise presided at the contempt hearing. Also, at the contempt hearing, Griffith testified that at the November 9 hearing "the judge said that he wanted every Lis Pendens filed revoked in—it was a two or three day time period.... And the judge, I think, asked ... at least the attorneys, if they understood clearly their obligation. The judge announced the detail, the injunction would be to prohibit them or any person in privity with the Phoenix Grain any— at all, to file any additional Notices Lis Pendens." Oles was personally present at the November 9 hearing, as was his then attorney.

On December 8, the bankruptcy court signed an injunction order (approved as to form by

Oles' counsel), which was filed and entered December 15, memorializing its November 9 oral order. This written order directed that Oles "file withdrawals of" the October 22 *lis pendens* notices and "of any and all other notices of lis pendens whenever or wherever filed with respect to the properties under consideration"; it further provided that Oles and others were

> "ordered not to take any action of any nature whatsoever to interfere with the sale of the Tulia property by Mr. Griffith, the Trustee. The declaratory judgment action in Adv. No. 287–2092 may proceed, subject to later consideration of the Trustee's motion to dismiss, but no lis pendens are to be filed regarding that adversary, nor any other action which would delay the sale, without prior permission of this Court.
>
> "They are jointly and severally further ordered to cooperate with the Trustee and to comply with all reasonable requests of the Trustee to conclude that sale."

sponse to the motion,[7] the bankruptcy court orally found Oles in criminal contempt of its November 9, 1987 order. On April 8, 1988, the bankruptcy court's written order for contempt was signed and entered of record.[8] Oles timely filed, *pro se*, objections to the order of contempt under Bankruptcy Rule 9020. These objections included assertions that the bankruptcy court lacked statutory and constitutional authority to determine guilt of and punish for criminal contempt, especially that not committed in its presence or for which imprisonment was imposed, and that "it was not proper to be prosecuted by a party-in-interest, but only by the court itself, or the district attorney, or a U.S. attorney, or an attorney especially appointed by the court."[9] Oles filed a *pro se* supporting brief, and Griffith's counsel filed a brief in response. Finally, without holding any hearing of its own or taking any further

evidence, the district court entered its above-noted August 26, 1988 "Memorandum Opinion and Contempt Order" from which Oles brings this appeal.

## Discussion

### I

### *Disinterested Prosecutor*

We first turn to the issue under *Young*.

It is clear that this criminal contempt was prosecuted by the Hipp estate trustee and the trustee's attorney as such. The trustee personally signed, swore to and served the "Motion to Avoid Notice Lis Pendens and for Contempt of Court" which charged Oles with violating the bankruptcy court's November 9 order by filing the November 13 and January *lis pendens* notices. That motion, the show cause order, the bankruptcy court's April 8 order con-

---

7. Oles' response, which he filed *pro se* (his attorney having withdrawn November 24), included, among other things, a plea of not guilty, a request for appointment of counsel due to alleged financial inability to retain counsel, a demand for jury trial, a request for continuance, a request for recusal because the bankruptcy judge allegedly had a personal bias, personal knowledge of disputed evidence, and might be a material witness, and an assertion that "this matter is a non-core matter and the Bankruptcy Court does not have jurisdiction over this matter."

Oles' referenced motions were all denied at the beginning of the April 5 hearing. Oles represented himself at the hearing, the Pretrial Services agency having determined earlier that morning that he had not demonstrated financial inability to retain counsel.

8. At the April 5 hearing, certified copies of five recorded *lis pendens* notices purportedly signed and acknowledged by Oles were introduced in evidence by Griffith, four dated November 13, 1987 (one filed that day in Swisher County, the others on November 20 in Castro County) and one dated January 12, 1988 (filed January 14 in Swisher County); those filed in Castro County each bore notations for return mailing to Oles; all concerned Hipp estate property and made reference to Hipp or its bankruptcy proceedings, and one of the Castro County notices specifically referred to the Hipp bankruptcy "Adversary No. 287–2092" concerning "Phoenix Grain Inc." and "David Oles." One witness, who knew the Oles family, when asked by Oles whether Oles had filed or caused the filing of the *lis pendens* notices, testified "they're signed by you" (to which Oles responded, "Yes. I understand that") and "they're all signed by you." There was no *direct* evidence that Oles filed or caused the filing of those *lis pendens* notices (and there was no evidence whatever he did not timely remove the notices filed prior to November 9).

The bankruptcy court, in its April 8 order, found that its November 9 order had directed Oles "[n]ot to do any act which would interfere with the Trustee's sale of the grain elevators, specifically not to file any further Lis Pendens" and "[t]o cooperate with the Trustee in the sale of the grain elevators"; that after having personal knowledge of that order, Oles "signed, acknowledged and recorded, or caused to be recorded, five further Notices of Lis Pendens" (which it thereafter identifies as those four dated November 13 and one dated January 12, above described); and it finds Oles "in willful contempt with respect to" each of the said five notices, sentencing him to a $500 fine and six months' confinement on each, and then providing the confinement terms would be concurrent and the fines cumulative. Neither the bankruptcy court's April 8 order nor its oral findings at the conclusion of the contempt hearing make any reference to "beyond a reasonable doubt" or any similar or equivalent terminology (the district court's August 26 opinion-order does, however, reflect its application of the "beyond a reasonable doubt" standard).

9. There were fifty-five objections in all. Among others were assertions that the evidence was insufficient in several respects, that Oles was wrongfully denied counsel and a jury trial, that he was not advised of his rights, and that the bankruptcy judge should have recused himself.

victing and sentencing Oles, the trustee's brief in the district court, and that court's August 26, 1988 opinion-order, are all styled essentially as follows: "In re: Hipp, Inc., Debtor, Thomas J. Griffith, Trustee vs. David Oles, Bankruptcy No. 285–20080, Adversary No. 287–7084." [10] The contempt hearing was called by the clerk as "Case Number 287–7084, Thomas J. Griffith, Trustee for Hipp, Inc. versus Phoenix Grain Company, Inc., Redonda Cotter, and David Oles, on a motion to avoid Notice Lis Pendens and for Contempt of Court, brought by the Plaintiff." *Cf. Gompers v. Bucks Stove & R. Co.*, 221 U.S. 418, 31 S.Ct. 492, 500, 55 L.Ed. 797 (1910).

When the bankruptcy court called for appearances at the April 5 hearing, the trustee's attorney announced, "Floyd Holder, attorney for Tom Griffith, the Petitioner in this case. Ready." After certain preliminary matters were disposed of, the bankruptcy court announced, "I believe that takes care of the preliminary matters. Mr. Holder, you may proceed on the Motion for Contempt." [11] Shortly thereafter, Oles interrupted Holder, and the bankruptcy court remarked, "Mr. Holder will present *his* case; then you will have your turn." (Emphasis added.) Holder then proceeded to present all the evidence supporting the contempt alleged in the trustee's "Motion to Avoid Notice Lis Pendens and for Contempt of Court," which was the only document referring to any contemptuous conduct.[12] Holder, *inter alia*, called Oles to the stand and asked if he would take the Fifth Amendment "with respect to any question I might ask you concerning the transactions alleged in the pleadings," the only "pleading" being the mentioned mo-

tion of the trustee.[13] Holder also introduced certified copies of the *lis pendens* notices, called Griffith to testify, and introduced other evidence tending to show that the November 13 *lis pendens* notices had frustrated a pending sale of Hipp estate property and at least suggesting that Oles had a hand in their being filed. The only evidence not presented by Holder was that which Oles presented, representing himself. The bankruptcy court called no witnesses, and no other attorney participated. After Oles had presented his evidence, the bankruptcy court asked if he had any further evidence, Oles said he did not, and the bankruptcy court stated: "Very well. I will hear *the Trustee's argument*, and then I will hear yours. Mr. Holder." (Emphasis added.) The trustee's counsel, Holder, then proceeded to argue why the evidence showed Oles was guilty of contempt. After Holder concluded, Oles argued, asserting, *inter alia*, that there was no proof he filed or caused to be filed the *lis pendens* notices in question. When Oles finished, the bankruptcy court stated: "Thank you. Mr. Holder, you get to close." Holder then made a brief closing argument, including assertions that "we don't simply allege in the Complaint that he filed; we said he executed these instruments and filed them. We proved ... that they were caused to be filed by Mr. Oles." Holder also filed with the district court, on behalf of "Thomas J. Griffith, Trustee," a brief in response to Oles' Rule 9020 objections, which concluded by stating: "Movant prays the Court approve the findings of the bankruptcy court and hold Mr. Oles in contempt."

Plainly, this criminal contempt was prosecuted by Griffith in his capacity as trustee

---

**10.** The show cause order (and the district court's August 26 opinion-order) add the word "Plaintiff" just after "Thomas J. Griffith, Trustee" and just before "vs."

**11.** The preliminary matters included the quashing of certain subpoenas which Oles had served on federal judicial employees and officers, as to which an assistant United States attorney, representing only the subpoenaed witnesses, appeared; the subpoenas were quashed before the substance of the contempt hearing began, and the assistant United States attorney took no part in the contempt hearing itself; nor did any

attorney for the government or any attorney who was not representing a private, interested party.

**12.** The show cause order merely directed Oles to show cause "why findings and sentence for contempt of court should not be issued against you as sought by the above named Plaintiff" (identified in the caption as "Thomas J. Griffith, Trustee, Plaintiff"); it did not in any way otherwise identify any allegedly disobeyed order or contemptuous conduct.

**13.** Oles claimed his privilege and did not testify.

of the Hipp bankruptcy estate through his lawyer, Holder. Moreover, it is clear from Griffith's testimony at the contempt hearing that he did not initiate the contempt at the request of the bankruptcy court, but rather, as he stated: "I initiated the contempt on my own, *as an interested party.*" (Emphasis added.) There is no indication that any attempt was made to have the contempt prosecuted by the United States attorney or anyone else.

■ We hold that this means of prosecuting Oles for criminal contempt violates the principle announced in *Young* by the Supreme Court in the exercise of its supervisory capacity over lower federal courts: an attorney who represents a party to the underlying litigation, for whose benefit the order allegedly violated was entered, may not represent the United States by prosecuting a criminal contempt for that violation because he likely cannot disinterestedly "pursue the public interest in vindication of the court's authority." 107 S.Ct. at 2136. Prosecution of criminal contempt by the attorney for such a party constitutes an inherent conflict of interest. *Id.*

Griffith argues that he is not an interested party because he was appointed trustee of the Hipp estate by the United States trustee and has no personal stake in the estate. The district court, approving this argument, noted that the Bankruptcy Code provides that the United States trustee, after consultation with parties in interest, shall appoint, subject to the court's approval, a "disinterested" person to serve as trustee. 11 U.S.C. § 1104(c). We find that once a disinterested person has been appointed to serve as the trustee of a bankruptcy estate, however, that individual becomes an interested party for purposes of the doctrine announced in *Young.* At this point, the trustee is charged by law to represent the interests of the estate against third parties claiming adversely to it. Griffith himself recognized this in his testimony that he acted "as an interested party." As the Supreme Court recently observed, albeit in a different context, "The bankruptcy trustee is 'the representative of the estate [of the debtor],' 11 U.S.C.

§ 323(a) ... not 'an arm of the Government.'" *California State Board of Equalization v. Sierra Summit,* — U.S. —, 109 S.Ct. 2228, 2233, 104 L.Ed.2d 910 (1989). The attorney for the trustee, then, cannot represent the United States—the public—disinterestedly, to perform the public function of prosecuting a criminal contempt.

Support for this reasoning is apparent from the proceedings in this case. Paragraph 5 of Griffith's motion for contempt of court states:

"[O]nly penal fine and confinement will serve to deter [Oles'] contemptuous conduct. Also, the Trustee should recover from David Oles his financial loss, which he estimates to be at least the sum of $250,000 by virtue of lost sale. Plaintiff also requests that the Court award attorney's fees and court costs and for general relief."

Obviously, then, in the contempt prosecution initiated against Oles by this motion, Griffith was necessarily mindful of his responsibility to pursue the interests of the Hipp estate rather than the public. Although during the contempt hearing the parties ultimately did not present evidence on the amount of damages or ask the bankruptcy court to determine the damages issue at that time, the Hipp estate would at some point likely be financially benefited by Griffith's successful prosecution of Oles.

Nor are we persuaded to a contrary result by the opinion in *Sassower v. Sheriff of Westchester County,* 824 F.2d 184, 191 (2d Cir.1987). There the issue was whether a state criminal contempt conviction was constitutionally invalid under the due process clause because the contempt proceedings were initiated by a party benefiting from the order allegedly violated. *Young,* however, is a supervisory power, not a due process, holding, as *Sassower* recognized. Moreover, in *Sassower,* "the attorney for the receiver merely moved for an order holding Sassower in contempt and notified him.... No investigation or other prosecutorial activity was required, because the court already had before it all the facts

needed...." *Id.* at 191. Indeed, in *Sassower*, there was no hearing, for Sassower refused to appear. *Id.* at 186–87. Here, by contrast, the private party's counsel actively prosecuted the entire contempt trial, securing and presenting the evidence and arguing the case. To distinguish the present case from *Young* on the basis of the degree of participation by the private "prosecutor" would render *Young* essentially meaningless.

Finally, where, as here, there is a *Young* violation, "harmless error analysis is inappropriate." *Id.*, 107 S.Ct. at 2141. Accordingly, *Young* requires reversal of Oles' conviction and sentence.

## II

### Bankruptcy Court Criminal Contempt Power

■ As another prosecution might be undertaken, and in light of the importance of the issue, we now turn to consideration of the bankruptcy court's power to hear and determine criminal contempts. We conclude that the bankruptcy court lacks such power, at least as to contempts not committed in (or near) its presence, so that in the event of further prosecution of this offense, the hearing and determination must be before and by the district court. While our holding in this respect is one of statutory construction and we do not ultimately determine whether this result is constitutionally mandated, our conclusion is nevertheless influenced by the perception that the constitutionality of the contrary position is subject to substantial question. We follow the settled rule that federal statutes, where they may reasonably be so construed without violence to their clear meaning, should be given an interpretation that avoids serious question as to their constitutional validity. *See, e.g., Gomez v. United States,* — U.S. —, 109 S.Ct.

2237, 2241, 104 L.Ed.2d 923 (1989) (Federal Magistrates Act, 28 U.S.C. § 636(b)(3)); *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932); *In re Castlerock Properties,* 781 F.2d 159, 162 (9th Cir.1986) (28 U.S.C. § 157(b)(2)).

### Criminal contempt

Before turning to the constitutional concerns, however, we digress briefly to note some of the characteristics of criminal contempts generally. As the Supreme Court stated in *Bloom v. State of Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), "Criminal contempt is a crime in the ordinary sense" and "in every fundamental respect"; likewise, "convictions for criminal contempt are indistinguishable from ordinary criminal convictions" and "that criminal contempt proceedings are 'criminal in their nature has been constantly affirmed.'" *Id.* 88 S.Ct. at 1481–82 & n. 3. Criminal, unlike civil, contempt requires a willful, contumacious or reckless state of mind. *See United States v. McCargo,* 783 F.2d 507, 510 (5th Cir.1986). *Cf. McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) (civil). Criminal contempt is denounced by 18 U.S.C. § 401, and may be punished by any term of imprisonment or amount of fine.[14] A defendant charged with that offense enjoys the presumption of innocence, must be proved guilty beyond a reasonable doubt, and cannot be compelled to testify against himself, *Gompers,* 31 S.Ct. at 499, and, at least for contempts not committed in the presence of the court, has the right to counsel. *Bloom,* 88 S.Ct. at 1484. If a sentence to confinement in excess of six months is to be imposed, there is a Sixth Amendment right to trial by jury. *Frank v. United States,* 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); *Codispoti v. Pennsylvania,* 418 U.S. 506, 94 S.Ct. 2687,

---

**14.** Though not by both. *See, e.g., United States v. Holmes,* 822 F.2d 481 (5th Cir.1987).

Section 401 provides as follows:

**"§ 401. Power of court**

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

41 L.Ed.2d 912 (1974). Further, a criminal (unlike a civil) contempt prosecution for violation of a court order is " 'a separate and independent proceeding' " from, and " 'is not a part of,' " the case in which the violated order was issued, and does not depend on the validity of that order or the continuation of the underlying proceedings. *Bray v. United States*, 423 U.S. 73, 96 S.Ct. 307, 309–10, 46 L.Ed.2d 215 (1925). *See also Gompers*, 31 S.Ct. at 499–502 ("Proceedings for civil contempt are between the original parties, and are instituted and tried as part of the main case. But ... proceedings ... for criminal contempt are between the public and the defendant, and are not part of the original cause." *Id.* at 499); *Michaelson v. United States*, 266 U.S. 42, 45 S.Ct. 18, 19, 69 L.Ed. 162 (1924); *Leman v. Krentler–Arnold Hinge Last Co.*, 284 U.S. 448, 52 S.Ct. 238, 240, 76 L.Ed. 389 (1932); *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947).

*Constitutional concerns*

The principal constitutional concern here arises from the fact that bankruptcy judges do not have the life tenure during good behavior and protection against diminished compensation which Article III, section 1, requires for federal judges exercising "[t]he judicial Power of the United States." The purpose of this provision was to establish an "independent" federal judiciary "to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 2864, 73 L.Ed.2d 598 (1987). *See also, e.g., Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3256, 92 L.Ed.2d 675 (1986) ("preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States" and "serves as 'an inseparable element of the constitutional system of checks and balances' " which "safeguards the role

of the Judicial Branch in our tripartite system"). The Supreme Court has many times touched on the constitutional limits of Congress' power to grant judicial authority and attributes to non-Article III entities such as territorial courts, *see, e.g., American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828), the Superior Court of the District of Columbia, *see, e.g., Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 1681–82, 36 L.Ed.2d 342 (1973), military courts-martial, *see, e.g., O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 1685, 23 L.Ed.2d 291 (1969); *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), United States magistrates, *see, e.g., United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), and federal administrative agencies, *see, e.g., Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 3333–39, 87 L.Ed.2d 409 (1985); *Atlas Roofing Co., Inc. v. Occupational Safety and Health Review Comm'n*, 430 U.S. 442, 97 S.Ct. 1261, 1266 & n. 7, 51 L.Ed.2d 464 (1977); *Crowell*, 52 S.Ct. at 297, among others. The Supreme Court in *Marathon* addressed the Article III limits on the jurisdiction of bankruptcy courts as those courts were constituted under the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2549 (1978 Act), and more recently alluded to Article III limits on the power of bankruptcy courts as they are organized under the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 (1984 Act). *Granfinanciera, S.A. v. Nordberg*, —— U.S. ——, 109 S.Ct. 2782, 2796–98, 106 L.Ed.2d 26 (1989).

No clear delineation of what subject matter jurisdiction or judicial attributes Congress may vest in a non-Article III entity emerges from these cases, though these two matters are undoubtedly interrelated. We do note, however, that to the extent that the constitutional boundary of bankruptcy court jurisdiction is dependent upon the public rights doctrine,[15] which it ap-

---

**15.** The Supreme Court's most recent pronouncement of this doctrine in *Nordberg* states that public rights are those that " 'arise between the

Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legisla-

pears to be, *see id.; Marathon*, 102 S.Ct. at 2871 (plurality opinion), that doctrine has never encompassed criminal matters. R. Fallon, *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv.L.Rev. 915, 952 & n. 208 (1988). The *Marathon* plurality went so far as to state in dictum—without dispute by any of the concurring or dissenting justices—that "[o]f course, the public-rights doctrine does not extend to any criminal matters, although the Government is a proper party." 102 S.Ct. at 2871 n. 24.

The serious constitutional problems attendant on Congress' vesting of contempt powers in bankruptcy courts is well documented in the legislative history of the 1978 Act. The House Judiciary Committee, considering the 1978 Act, urged that the new bankruptcy judges should be vested with all the requisite attributes of Article III judges because they were to enjoy both broad jurisdiction and broad powers, specifically the powers to conduct contempt proceedings and jury trials, to issue writs, and to enjoin state courts. H.R. No. 95–595, 95th Cong. 1st Sess., *reprinted in* 1978 U.S.Code Cong. & Adm.News 5787, 5963, 5999.

*Inherent criminal contempt power*

Having thus noted that interpreting the 1984 Act as granting criminal contempt powers to bankruptcy courts engenders serious constitutional issues, but without resolving those issues, we interpret the 1984 Act as making no such grant. Before explaining the reasoning supporting this interpretation, we address the issue of whether the bankruptcy court has *inherent* criminal contempt powers. Several bankruptcy courts have ruled that the *civil* contempt power is inherent even in such non-Article III bodies as bankruptcy courts. *See, e.g., In re Skinner*, 90 B.R. 470 (D.Utah 1988); *In re Kennedy*, 80 B.R. 673 (Bankr.D.Del.1987); *In re Shafer*, 63 B.R. 194 (Bankr.D.Kan.1986); *In re Miller*, 81 B.R. 669, 676 (Bankr.M.D.Fla.1988); *In re McLean Industries, Inc.*, 68 B.R. 690, 695–96 (Bankr.S.D.N.Y.1986); *In re L.H. & A. Realty Inc.*, 62 B.R. 910 (Bankr.D.Vt.1986); *In re Johns–Manville Corp.*, 26 B.R. 919 (Bankr.S.D.N.Y.1983). The Ninth Circuit and several other courts have disagreed. *See, e.g., In re Sequoia Auto Brokers, Ltd., Inc.*, 827 F.2d 1281 (9th Cir.1987); *In re Omega Equipment Corp.*, 51 B.R. 569, 573 (D.D.C.1985); *In re Cox Cotton Co.*, 24 B.R. 930 (D.Ark.1982), *vacated, Lindsey v. Ipock*, 732 F.2d 619 (8th Cir.1984); *cf. In re Walters*, 868 F.2d 665, 669–70 (4th Cir. 1989) (not considering whether bankruptcy courts have inherent civil contempt powers but finding that such power is statutorily granted to them). We join the Ninth Circuit at least to the extent that we hold that bankruptcy courts do not have inherent *criminal* contempt powers, at least with respect to the criminal contempts not committed in (or near) their presence.[16]

tive departments,'" 109 S.Ct. at 2795 n. 8 (quoting *Crowell*, 52 S.Ct. at 292), as well as those seemingly private rights created by Congress acting pursuant to its constitutional powers under Article I and that are "'so closely integrated into a public regulatory scheme as to be a matter appropriate for [non-Article III] resolution with limited involvement by the Article III judiciary.'" *Id.* 109 S.Ct. at 2797 (quoting *Thomas*, 105 S.Ct. at 3343 (Brennan, J., concurring in judgment)).

16. Our concerns over the constitutionality of bankruptcy courts exercising criminal contempt powers also leads us to doubt that criminal contempt powers are inherent in bankruptcy courts. The two propositions are logically exclusive: it could hardly be unconstitutional for a tribunal to exercise its inherent powers; conversely, to the extent that the inherent power of criminal contempt emanates from Article III, it may well be an essential attribute of judicial power that cannot be vested in a non-Article III entity without endangering our federal structure of separate and independent branches of government.

For example, in affirming the constitutionality of the Federal Magistrates Act, several circuit courts have found it persuasive that contempt powers were not granted to magistrates:

"[A] clear line of demarcation between the power of an Article III judicial officer and a magistrate ... may be found in the allocation of the contempt power, because, under no aspect of the Magistrate Act, can a magistrate punish for contempt. 28 U.S.C. § 636(e). According to section 636(e), if an individual commits an act constituting contempt of court, the magistrate must certify the facts of the incident to a district judge. The judge, after holding a hearing and evaluating the allegedly contemptuous conduct, may determine the nature and severity of appropriate

The Supreme Court has many times stated that the contempt power is inherent in all federal courts. *See, e.g., Young,* 107 S.Ct. at 2131; *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *Michaelson,* 45 S.Ct. at 20; *In re Terry,* 128 U.S. 289, 9 S.Ct. 77, 79, 32 L.Ed. 405 (1888); *Ex parte Robinson,* 86 U.S. (19 Wall.) 505, 510–11, 22 L.Ed. 205 (1873); *United States v. Hudson,* 11 U.S. (7 Cranch.) 32, 3 L.Ed. 259 (1812).[17] An oft-quoted explanation of this power comes from *Robinson:*

> "The power to punish for contempts is inherent in all courts. Its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts; and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." 86 U.S. at 510, 22 L.Ed. at 207.

This statement might be construed with its emphasis on *"all courts"* rather than "courts of the United States." [18] We do not, however, so construe it. One of our reasons for rejecting that construction was stated quite adequately by the district court in *Omega:*

> "[These cases] beg the question. Each has arisen in connection with an exercise of the power by a court which was indisputably of Art. III stature, and each has adverted to necessity as a justification for finding the existence of contempt power because there was nowhere else to go to vindicate the authority of the court exercising it. Neither condition obtains in the case of bankruptcy courts. They are concededly not Art. III courts, and they have immediate recourse to Art. III courts to enforce compliance with their orders." 51 B.R. at 573.

As the bankruptcy court in *Miller* conceded, *Young* and *Michaelson* stand for the proposition that the contempt power is necessary to ensure that the judiciary has a means to vindicate its authority without dependence on other branches of government. 81 B.R. at 675. *See also Young,* 107 S.Ct. at 2131. Contrary to the court's

---

punishment, if indicated. Unlike the relatively mechanical entry of judgment, the power to punish for contempt of court is the means by which many court judgments, not including the collection of money judgments, are enforced.... The vesting of this power exclusively in the hands of Article III judicial officers would seem, for present purposes at least, to provide an adequate distinction between such judges and non-Article III officers. This clear line also serves to limit the ultimate exercise of judicial power to persons enjoying the constitutional guarantee of independence." *Geras v. Lafayette Display Fixtures, Inc.,* 742 F.2d 1037, 1044 (7th Cir.1984).
*See also Collins v. Foreman,* 729 F.2d 108, 117 (2d Cir.), *cert. denied,* 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); *Pacemaker Diagnostic Clinic of America v. Instromedix,* 725 F.2d 537, 545 (9th Cir.), *cert. denied,* 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

**17.** This power has been traced back to the practice of English common law courts. *In re McConnell,* 370 U.S. 230, 82 S.Ct. 1288, 1291, 8 L.Ed.2d 434 (1962); *Green v. United States,* 356 U.S. 165, 78 S.Ct. 632, 635–36, 2 L.Ed.2d 672 (1958). The first mention of the contempt power in a statute of the United States was in section 17 of the Judiciary Act of 1789, 1 Stat. 73, 83, which stated that inferior federal courts "shall have power to ... punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same...." This awesome power was unlimited until the Act of 1831, 4 Stat. 487, 488, which confined the *summary* power of punishment to misbehaviors in the presence of a court or so near thereto as to obstruct the administration of justice. Section 401, 18 U.S.C., is a successor to the Act of 1831.

**18.** The Ninth Circuit in *Sequoia* traced bankruptcy court contempt powers under the 1978 Act to its amendment of 28 U.S.C. § 451, defining "court of the United States," for purposes of Title 28, as including bankruptcy courts. 827 F.2d at 1287. The *Sequoia* court reasoned that because 18 U.S.C. § 401 includes no definition of "courts of the United States" and was originally codified in Title 28, the amendment of this definition in 28 U.S.C. § 451 effectively made bankruptcy courts "United States Courts" for purposes of 18 U.S.C. § 401 as well, and that they thereby acquired criminal contempt powers. However, the court noted, this definition was repealed by the 1984 Act. Nevertheless, we observe that section 401 may be considered a limiting statute, *see* note 17, *supra; In re Michael,* 326 U.S. 224, 66 S.Ct. 78, 79, 90 L.Ed. 30 (1945), rather than a grant of contempt powers which were viewed as inherent in Article III courts.

reasoning in *Miller*, we agree with the Ninth Circuit's conclusion that this proposition points to Article III, with its separation of powers and checks and balances values, as the source of this inherent power to punish contempt. *Sequoia*, 827 F.2d at 1284. "[T]he contempt power, like all powers of the federal courts, cannot be inherited from thin air, but must flow from the Constitution." *Cotton*, 24 B.R. at 950.

The Supreme Court has indicated that Congress itself has no inherent general contempt powers, but enjoys only the power expressly granted to it by the Constitution (*e.g.*, the Article I, section 5, provision empowering Congress to deal with misconduct of its own members), and such power as is ancillary or incidental to these express powers. *See, e.g., Marshall v. Gordon*, 243 U.S. 521, 37 S.Ct. 448, 451, 61 L.Ed. 881 (1917); *Kilbourn v. Thompson*, 103 U.S. 168, 188–90, 26 L.Ed. 377, 386–87 (1880).[19]

Similarly, without ruling on whether such grants are constitutional, we note that when Congress has intended non-Article III adjudicatory entities to possess criminal contempt powers, it has statutorily granted those powers. For example, 10 U.S.C. § 848 explicitly grants military courts-martial the power to punish for contempt for certain acts committed in their presence and within a set penalty. The tax court, pursuant to 26 U.S.C. § 7456(c), may punish contempts as an "incidental power."[20] Significantly, in a case decided before the tax court was granted this power, the Ninth Circuit stated that it had no inherent contempt powers. *MacRae v. Riddell*, 350 F.2d 291, 292 (9th Cir.1965), *cert. denied*,

382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966) (however, this was before the tax court was explicitly designated an Article I court in 1969 by 26 U.S.C. § 7441).

Territorial courts are also non-Article III courts, created by Congress pursuant to Article IV, section 3, of the Constitution. The Supreme Court has held that Article III is not affronted by Congress' creation of such courts. *Canter*, 26 U.S. (1 Pet.) at 545–46. Territorial courts exercise the contempt power, *see, e.g., Phelan v. People of Territory of Guam*, 394 F.2d 293, 297 (9th Cir.1968) (stating that Fed.R.Crim.P. 42, detailing the procedures for trying criminal contempts, applies to contempts prosecuted by these courts), but no court has expressly ruled on the constitutionality of this exercise of power.

A few relatively dated decisions in other circuits cursorily declare that the contempt power is inherent in territorial courts, *see, e.g., Francis v. People of the Virgin Islands*, 11 F.2d 860, 864 (3d Cir.), *cert. denied sub nom. Francis v. Williams*, 273 U.S. 693, 47 S.Ct. 91, 71 L.Ed. 843 (1926); *Fleming v. United States*, 279 F. 613, 616 (9th Cir.), *cert. dismissed*, 260 U.S. 752, 43 S.Ct. 10, 67 L.Ed. 496 (1922), but this conclusion may be open to question. Instead, the criminal contempt power appears to be statutorily granted to these courts through such language as the following:

"The District Court of Guam shall have the jurisdiction of a district court of the United States, including, but not limited to, the diversity jurisdiction provided

**19.** In *Marshall*, the Court stated:
"As it is unthinkable that in any case from a power expressly granted there can be implied the authority to destroy the grant made, and as the possession by Congress of the commingled legislative-judicial authority as to contempts which was exerted in the House of Commons would be absolutely destructive of the distinction between legislative, executive, and judicial authority which is interwoven in the very fabric of the Constitution, and would disregard express limitations therein, it must follow that there is no ground whatever for assuming that any implication as to such a power may be deduced from any grant of authority made to Congress by the Constitution." 37 S.Ct. at 451.

**20.** This Circuit has ruled in some of these cases without addressing the constitutionality of this grant. *See, e.g., Dornbusch v. Commissioner of Internal Revenue Service*, 860 F.2d 611 (5th Cir. 1988) (transfer of appeal); *McDougal v. Commissioner of Internal Revenue Service*, 818 F.2d 453 (5th Cir.1987) (civil contempt). *See also Continental Equities, Inc. v. C.I.R.*, 551 F.2d 74, 83–84 (5th Cir.1977). *But see Burns, Stix Friedman & Co. v. Commissioner of Internal Revenue*, 57 T.C. 392, 395–96 (1971) (ruling, but not in a contempt case, that the 1969 creation of the tax court as an Article I court with such judicial powers as the power to punish for contempt was constitutional).

for in section 1332 of Title 28, and that of a bankruptcy court of the United States." 48 U.S.C. § 1424(b). *See also* 48 U.S.C. § 1612(a) (Virgin Islands). The jurisdiction of a district court of the United States certainly encompasses federal criminal prosecutions, including criminal contempt. *See* 18 U.S.C. § 3231.[21]

The Superior Court for the District of Columbia and the District of Columbia Court of Appeals, which function as state courts much like territorial courts do, are similarly constitutional. *Palmore*, 93 S.Ct. at 1681. Congress has vested both with contempt powers equal to those enjoyed by Article III courts. D.C.Code Ann. §§ 11–944, 11–741.

Finally, we are unsure even that today's bankruptcy courts are "courts" in a generic sense not defined strictly by Article III. Prior to the 1978 Act, several cases held that the bankruptcy courts had inherent contempt powers, *see, e.g., Isaacs v. Hobbs Tie & Timber Co.*, 76 F.2d 209, 212 (5th Cir.), *cert. denied*, 295 U.S. 753, 55 S.Ct. 834, 79 L.Ed. 1697 (1935); *Boyd v. Glucklich*, 116 F. 131, 135 (8th Cir.1902), but the "bankruptcy courts" that those cases referred to were clearly the Article III district courts sitting in bankruptcy, which had bankruptcy referees assigned to them to carry out largely administrative chores

in bankruptcy cases. *Id.* The bankruptcy court of the 1978 Act, which the *Marathon* Court assessed, was not the district court, but was an "independent adjunct" of the district court. 28 U.S.C. § 151, *et seq.* Under the 1978 Act, the *Marathon* plurality was too uncomfortable with the bankruptcy court's autonomy from the district court, as reflected in its organization, *id.*, and its jurisdiction, 28 U.S.C. § 1471, to closely analogize it to magistrates or agencies. The plurality found instead that it was more than an arm of the district court—it was a court in its own right.

Under the 1984 Act, much of the autonomy has been stripped from the bankruptcy courts, now labeled "units" of the district courts. 28 U.S.C. § 151. Sections 1471 through 1482 of Title 28 were repealed, including the power to conduct jury trials, and the bankruptcy court's jurisdiction was largely restricted to "core" matters under 28 U.S.C. § 157. In noncore matters, the bankruptcy court makes proposed findings and conclusions, which are subjected to *de novo* approval of the district court. *Id.* at § 157(c)(1). The district court has the discretion to refer cases to the bankruptcy court, and to withdraw them from that court at any time for cause shown. *Id.* at § 157(d). Further, the power to appoint

---

**21.** Even if territorial courts have inherent contempt powers like Article III courts, we nevertheless conclude that these courts are distinguishable from bankruptcy courts. The Supreme Court has stated many times that such non-Article III courts are unique because they function as state courts, overseeing both local and federal law, *see, e.g., Marathon*, 102 S.Ct. at 2868 (plurality); *Palmore*, 93 S.Ct. at 1679–82; *Canter*, 26 U.S. (1 Pet.) at 546.

Territorial courts created pursuant to Article IV, section 3, may be said to represent an exercise of national power that, in contrast to power exercised under Article I, does not displace state power which would have otherwise existed in the particular area absent creation of the national government (and, when a state is formed from the area, the territorial courts are succeeded by state courts and Article III courts. *See Benner v. Porter*, 50 U.S. (9 How.) 235, 242–43, 13 L.Ed. 119, 122–23 (1850)). In *Palmore*, it was held respecting courts created under Article I, section 8, clause 17, that "Congress was not required to provide an Art. III court for the trial of criminal cases arising under its laws applica-

ble only within the District of Columbia," 93 S.Ct. at 1682, but *O'Donoghue v. United States*, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), was distinguished, rather than being overruled, on the ground that the District of Columbia courts there involved had jurisdiction of cases arising under federal laws "having nationwide application." *Palmore*, 93 S.Ct. at 1680. Further, the section 8, clause 17, power of Congress differs from other Article I powers in that it is limited to particular geographic areas that may, after adoption of the Constitution, be voluntarily relinquished by a particular state or states. Accordingly, *Palmore* does not suggest that the special considerations which render Article III inapplicable to territorial courts, and to local law only District of Columbia courts, extend to bankruptcy courts.

Thus, even if territorial courts (or District of Columbia local law only courts) have inherent criminal contempt powers despite not being Article III courts, we nevertheless conclude that bankruptcy courts do not, at least as to contempts of the section 401(3) variety.

and remove bankruptcy judges lies with the Article III judiciary. 28 U.S.C. § 152.

In short, today's bankruptcy courts are arguably at least as much like magistrates or even administrative agencies as they are like other non-Article III courts. Magistrates, who with the consent of the parties may conduct jury trials in civil cases and criminal misdemeanors, 28 U.S.C. § 636(c); 18 U.S.C. § 3401, may only certify facts showing contempt to district courts. 28 U.S.C. § 636(e). Circuit courts have cited this limitation on magistrates' contempt power as support for their holdings that the Federal Magistrates Act is constitutional.[22]

Similarly, administrative agencies may order persons to act or refrain from acting, but must usually look to Article III courts to enforce those orders if they are not voluntarily obeyed. *See, e.g.,* 15 U.S.C. §§ 45(*l*), (m) (Federal Trade Commission orders). *See also Reisman v. Caplin,* 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); *Belle Fourche Pipeline Co. v. United States,* 751 F.2d 332 (10th Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). Indeed, the Supreme Court has stated in dictum that it would affront our constitutional structure for contempt adjudication to "be committed to a subordinate administrative or executive tribunal for final determination." *ICC v. Brimson,* 154 U.S. 447, 14 S.Ct. 1125, 1136, 1137–38, 38 L.Ed. 1047 (1894).

*Statutory grant of criminal contempt power*

The 1984 Act makes no explicit reference to the contempt powers of bankruptcy courts. Only two provisions of the 1984 Act can arguably be viewed as the source of the power to hold persons in criminal contempt. The first, 11 U.S.C. § 105, states in relevant part:

"(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

" . . . .

"(c) The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28. This subsection shall not be interpreted to exclude bankruptcy judges and other officers or employees appointed pursuant to chapter 6 of title 28 from its operation."

Probably a majority of the courts that have ruled that the 1984 Act grants civil contempt powers have found that the power emanates at least from this section. *See, e.g., In re Walters,* 868 F.2d at 669; *Kellogg v. Chester,* 71 B.R. 36 (N.D.Tex. 1987); *Better Homes of Va., Inc. v. Budget Service Co.,* 52 B.R. 426, 430 (D.D.C.1985), *affirmed,* 804 F.2d 289 (4th Cir.1986); *In re Dennig,* 98 B.R. 935 (Bankr.N.D.Ind. 1989); *In re Clark,* 91 B.R. 324 (Bankr.E. D.Pa.1988); *In re Newport Offshore, Ltd.,* 88 B.R. 566 (Bankr.D.R.I.1988); *In re Hamilton Allied Corp.,* 87 B.R. 43 (Bankr. S.D.Ohio 1988); *In re Grosse,* 84 B.R. 377 (Bankr.E.D.Pa.1988), *affirmed,* 96 B.R. 29 (E.D.Pa.), *affirmed,* 879 F.2d 857 (3d Cir. 1989) (unpublished); *In re Shafer,* 63 B.R. 194 (Bankr.D.Kan.1986). We conclude, however, that section 105 does not purport to authorize bankruptcy courts to punish for criminal contempts, at least not those under section 401(3). Criminal contempt is not "necessary or appropriate to enforce or implement" the court's rules or orders, but is instead intended to vindicate the authority of the court. *Gompers,* 31 S.Ct. at 498. Civil contempt compensates the party in whose favor the breached order was issued, or coerces compliance with the court's orders; thus it might arguably be characterized as helping to "enforce or implement" the court's orders. *See, e.g., In*

---

**22.** *See* note 16, *supra.*

re *Walters*, 868 F.2d at 669. Conversely, section 401(3) criminal contempt, strictly an independent proceeding "between the public and the defendant" to punish for willfully disobeying a court's orders, whether or not valid, is not "necessary" under section 105. *Better Homes*, 52 B.R. at 430.

Neither the other provisions nor the legislative history of the 1978 Act, in which section 105 was added to the bankruptcy laws, demonstrates otherwise. The 1978 Act also included 28 U.S.C. § 1481, repealed by the 1984 Act, which stated:

> **"Section 1481. Powers of bankruptcy court.**
>
> "A bankruptcy court shall have the powers of a court of equity, law, and admiralty, but may not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment."

The limitation of the contempt power in the second part of this sentence is the only mention in the 1978 Act of such power, and necessarily implies that the power exists, including criminal contempt power. We conclude that the grant of contempt power in the 1978 Act was in 28 U.S.C. § 1481 rather than 11 U.S.C. § 105.

The House Judiciary Committee, reporting on an earlier version of the 1978 Act that did not include the limiting portion of 28 U.S.C. § 1481, stated that "[t]he bill contemplates that the new bankruptcy courts will have contempt power commensurate with their responsibilities, and equal to the contempt power of other Federal courts," but did not there specify the source of that power. H.R. No. 95–595, 95th Cong.2d Sess., *reprinted in* U.S.Code Cong. & Adm.News 5963, 5974. However, with specific reference to section 1481, the report states that:

> "This section *gives* the bankruptcy court the powers of a court of equity, law, and admiralty. It is the concomitant of the bankruptcy courts [*sic*] increased jurisdiction, and is necessary to enable the bankruptcy court to exercise that jurisdiction and its powers under the bankruptcy code." *Id.* at 6404 (emphasis added).

The report also says that the powers granted in section 1481 are in addition to any power granted under 11 U.S.C. § 105.

Also supporting the conclusion that section 1481 was the source of the contempt powers granted in the 1978 Act is Bankruptcy Rule 9020, submitted to Congress by the Supreme Court in 1983 acting pursuant to the Court's power granted in 28 U.S.C. § 2075 to promulgate bankruptcy court rules. That rule, entitled "Criminal Contempt Proceedings," sets out the procedures to be followed by a bankruptcy court in cases of "[c]riminal contempt which may be punished by a bankruptcy judge acting pursuant to 28 U.S.C. § 1481," and also authorizes certification of the facts to the district court if the bankruptcy court "is without power under 28 U.S.C. § 1481, to punish or to impose the appropriate punishment for the criminal contempt." Congress did not alter this rule before it became effective.

The 1987 version of Rule 9020, now entitled simply "Contempt Proceedings," covers both civil and criminal contempt, and eliminates all references to section 1481. However the advisory committee note accompanying the rule states that "[t]he United States Bankruptcy Courts, as constituted under the Bankruptcy Reform Act of 1978, were courts of law, equity, and admiralty with an inherent contempt power, but former 28 U.S.C. § 1481 restricted the criminal contempt power of bankruptcy judges." In saying that the contempt power of bankruptcy courts under the 1978 Act was "inherent," the committee obviously meant that the power was inherent in the status of the courts as courts of "law, equity, and admiralty," which status was conferred on them by (and only by) the express terms of now repealed section 1481. The note goes on to state that "[t]his rule, as amended, recognizes that bankruptcy judges may not have the power to punish for contempt."

We conclude that section 1481 was indeed the source of the contempt power of bankruptcy courts under the 1978 Act.

We next turn to the 1984 Act to determine whether any of its provisions granted the contempt powers formerly authorized by 28 U.S.C. § 1481. The extensive revisions of the 1984 Act were largely in response to the Supreme Court's concerns in *Marathon*. As noted, sections 1471 through 1482 of Title 28 were repealed. Section 151 of that title was amended to make bankruptcy courts "units" of the district courts, and the provisions following section 151 put those courts much more under the control of Article III courts. The power of bankruptcy courts to conduct jury trials, 28 U.S.C. § 1480, and to issue writs of habeas corpus, 28 U.S.C. § 2256, were also repealed.

Section 157, 28 U.S.C., entitled "Procedures," was added by the 1984 Act. That section allows the district courts to refer cases to the bankruptcy courts, and allows the latter to enter final judgments in "core" proceedings as well as noncore but "related" proceedings in which the parties consent to the reference to the bankruptcy court. Core proceedings are those under Title 11 or that arise in Title 11 cases, but does not include those only related to Title 11 cases. 1 *Collier on Bankruptcy* 3–36 (1989). Bankruptcy court decisions in core proceedings, and consent referred related proceedings, may be appealed to the district court, which applies the standard of review generally applied in federal court appeals. In noncore, nonconsent related proceedings, the bankruptcy court conducts a hearing and submits proposed findings and conclusions to the district court which then enters any final order or judgment after *de novo* review of any timely objected to matters. Section 157(b)(2) explicitly lists several core matters, including a catchall provision, but states that the list is not exhaustive.

The legislative history indicates that section 157 was meant to mend the deficiencies specifically held unconstitutional in *Marathon*: that bankruptcy court jurisdiction over strictly state law claims infringed on Article III separation of powers. This history is limited to statements made by legislative leaders on the floor of Congress. 1984 U.S.Code Cong. & Adm.News 576, 576–606. The history does not discuss contempt powers, or the *Marathon* plurality's broad language that could be interpreted as prohibiting such bankruptcy court powers as contempt.

Several lower courts have determined that civil contempt proceedings, though they do not fit within any of the explicit "core" proceedings listed, do fit within the section 157(b)(2)(O) catchall provision, which includes as being core "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims." *See, e.g., In re Hamilton Allied Corp., supra; In re Shafer, supra; In re L.H. & A. Realty Inc., supra; In re Depew,* 51 B.R. 1010 (E.D.Tenn.1985); *In re Kalpana Electronics, Inc.,* 58 B.R. 326 (Bankr.E.D.N.Y.1986). In effect, these courts have reasoned that civil contempt is itself core because it is inseparable from the obviously core proceedings that the civil contempt power helps to facilitate.[23]

If bankruptcy civil contempt orders may arguably be core because their compliance coercive, remedial nature makes them inseparable from the underlying core proceedings, just as civil contempts generally have been viewed as part of the underlying case, then the same considerations may likewise arguably support an implicit section 157 grant to bankruptcy courts of civil contempt power. However, these considerations do not support the inference that Congress empowered bankruptcy courts to criminally punish for willful disobedience of their orders, especially where the disobedience was not in (or near) the presence of the court. As we have earlier noted, such criminal contempts—unlike their civil counterparts—are separate and independent proceedings (with different parties) from that in which the violated order was issued,

---

**23.** In dictum, some of these courts have distinguished civil and criminal contempt, stating that the latter is not core because it is collateral to and independent of any underlying core proceedings. *See, e.g., In re L.H. & A. Realty Inc.,* 62 B.R. at 912.

the validity of that order (at least assuming there was jurisdiction to enter it) is not in question in the contempt proceeding, and the contempt can be prosecuted even after the underlying proceeding has wholly terminated. We accordingly conclude that such a criminal contempt for violation of a bankruptcy court order is not itself a "core" proceeding or a case under Title 11. Further, that the criminal contempt consists of willful violation of a bankruptcy court order does not mean that the prosecution of that contempt is "related" to the Title 11 case in which the violated order was issued, for when the criminal prosecution—itself "a separate and independent proceeding" between different parties—is commenced, the Title 11 case may have wholly terminated, so that there would be no Title 11 case to which the criminal contempt proceedings could be related.[24] In *Bray*, 96 S.Ct. at 309, the Court found that a criminal contempt for violation of an order in an Economic Stabilization Act (ESA) case did not have to be appealed to the Temporary Emergency Court of Appeals as did the underlying ESA controversies:

"[R]ather than 'arising under' any provision of the Act, the contempt prosecution was commenced under 18 U.S.C. § 401, the provision of the Criminal Code that empowers federal courts to punish certain contempts of their authority.... Al-

though the contempt charge related to an order entered in connection with an investigation of Stabilization Act violations, it was not dependent on the existence of such violations or even the continuation of the investigation."

Because Congress intended the 1984 Act to curtail the jurisdiction and power of the bankruptcy courts, we cannot hold that it then implicitly granted them the power to try and sentence for criminal contempt for violations of their orders but eliminated all the constraints which had been imposed when they were previously given criminal contempt powers. We find nothing in the 1984 Act that gives bankruptcy courts such criminal jurisdiction. We hold that criminal contempts under section 401(3) for violation of bankruptcy court orders are neither core nor related proceedings under section 157, and that bankruptcy courts do not have jurisdiction to try, or convict and sentence for, such contempts.[25]

*Rule 9020;* de novo *review*

Nor is our conclusion in this respect altered by Rule 9020 or the fact that the district court here purported to itself convict Oles of criminal contempt and sentence him for that offense.

We do not construe Rule 9020 as a purported grant of criminal contempt power to bankruptcy courts.[26] The advisory committee note to the rule's current version, prom-

---

**24.** Further, the violated bankruptcy court order may have been issued in a case which itself was only "related to a case under Title 11." *See* § 157(c)(2).

**25.** This holding is fully consistent with *United States v. Revie*, 834 F.2d 1198 (5th Cir.1987), cert. denied, 487 U.S. 1205, 108 S.Ct. 2845, 101 L.Ed.2d 882 (1988). There Revie was tried and convicted by the district court for criminal contempt by violating (by failure to appear) a *civil* contempt show cause order which the bankruptcy court had entered after Revie had failed to comply with the bankruptcy court's prior turnover order. After Revie failed to appear in response to the bankruptcy court's civil contempt show cause order, that court certified the facts to the district court and the district court caused the criminal contempt proceedings to be initiated. Revie contended that the order which he was convicted of violating—the bankruptcy court's civil contempt show cause order—was void as beyond the bankruptcy court's jurisdiction. We rejected this, holding that the bank-

ruptcy court had jurisdiction to issue the show cause order.

**26.** The current (1987) version of Rule 9020 provides as follows:

**"Rule 9020. Contempt Proceedings**

**"(a) Contempt committed in presence of bankruptcy judge**

"Contempt committed in the presence of a bankruptcy judge may be determined summarily by a bankruptcy judge. The order of contempt shall recite the facts and shall be signed by the bankruptcy judge and entered of record.

**"(b) Other contempt**

"Contempt committed in a case or proceeding pending before a bankruptcy judge, except when determined as provided in subdivision (a) of this rule, may be determined by the bankruptcy judge only after a hearing on notice. The notice shall be in writing, shall state the essential facts constituting the contempt charged and describe the contempt as criminal or civil and shall state the time and place

ulgated in 1987, states that the rule "recognizes that bankruptcy judges may not have the power to punish for contempt." Moreover, the bankruptcy rules are intended to be procedural, rather than substantive, in character. *See* 28 U.S.C. § 2075 ("such rules shall not abridge, enlarge, or modify any substantive right"). And, inferior federal court jurisdiction is generally a matter which the Constitution, subject to the constraints of Article III, commits to Congress. *See, e.g., Palmore*, 93 S.Ct. at 1678; *Cary v. Curtis*, 44 U.S. (3 How.) 236, 243–46; 11 L.Ed. 576, 581 (1845). These considerations strongly militate against finding that Rule 9020 purports to grant bankruptcy courts a jurisdiction which we have held that Congress did not expressly or impliedly authorize for them.

Nor do we consider that the lack of bankruptcy court jurisdiction can be overlooked because of the availability of district court *de novo* review under Rule 9020(c) and Rule 9033(d).[27] Rule 9020(c) contemplates that, in the absence of timely post-order objections by the party charged, the bankruptcy court's "order of contempt"—in a criminal contempt, its conviction and sentence or, presumably, its acquittal—"shall have the same force and effect as" if "entered by the district court." If no objections are filed, then it is the bankruptcy court's sentence under which the defendant will be incarcerated, which makes that court's jurisdiction crucial; it is also crucial in the case of an acquittal. Even where the *de novo* review available is *truly de novo*—*i.e.*, a further trial proceeding at which the determination will be based solely on the evidence freshly presented in open court at that further proceeding, in contrast to review under Rule 9033(d) which may be solely on the record and without any additional hearing or evidence—the fact that the initial proceeding lacked a constitutionally competent adjudicator may nonetheless be fatal. *See, e.g., Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 83–84, 34 L.Ed.2d 267 (1972) (potentially biased judge); *Callan v. Wilson*, 127 U.S. 540, 8 S.Ct. 1301, 32 L.Ed. 223 (1888) (lack of a jury).[28] Further, here the proceedings were conducted on the premise that the bankruptcy court was the tribunal with the power not only to conduct the trial but also to acquit or convict and sentence; the bankruptcy court proceeded to do just that; Oles objected from the beginning to the bankruptcy court's jurisdiction to try and adjudicate the contempt; and the case was before the district court only on review, under Rule 9020(c) and Rule 9033(d), of the bankruptcy court's conviction and sentence.

Finally, under Rule 9020 and Rule 9033(d) the review, although *de novo*, may

---

of hearing, allowing a reasonable time for the preparation of the defense. The notice may be given on the court's own initiative or on application of the United States attorney or by an attorney appointed by the court for that purpose. If the contempt charged involves disrespect to or criticism of a bankruptcy judge, that judge is disqualified from presiding at the hearing except with the consent of the person charged.

"(c) **Service and effective date of order, review**
"The clerk shall serve forthwith a copy of the order of contempt on the entity named therein. The order shall be effective 10 days after service of the order and shall have the same force and effect as an order of contempt entered by the district court unless, within the 10 day period, the entity named therein serves and files with the clerk objections prepared in the manner provided in Rule 9033(b). If timely objections are filed, the order shall be reviewed as provided in Rule 9033.

"(d) **Right to jury trial**
"Nothing in this rule shall be construed to impair the right to jury trial whenever it otherwise exists."

27. Rule 9020 is quoted in note 26, *supra*. Rule 9033(d) provides:
"(d) **Standard of review**
"The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions."

28. In *Ludwig v. Massachusetts*, 427 U.S. 618, 96 S.Ct. 2781, 49 L.Ed.2d 732 (1976), the Supreme Court held that *Callan* did not apply to the states; but a majority of the justices apparently viewed it as having continuing validity in the federal system.

nevertheless be, as it was here, *entirely* on the bankruptcy court record and without any further hearing or evidence whatever. As we have noted, criminal contempt is a crime, and criminal contempt trials are in essence criminal trials. In *Raddatz*, the Court held that magistrates might constitutionally conduct suppression hearings in criminal cases, as the district court retained the ultimate authority and responsibility to make the final suppression decision without being required to give any deference to the magistrate. But in so holding, the Court noted "that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself." *Id.*, 100 S.Ct. at 2414. The present case, of course, deals with "the criminal trial itself." Moreover, *Raddatz* clearly recognized the importance of the decision maker personally hearing the evidence, the principle that " 'the one who decides must hear.' " *Id.* at 2413. It went on to illustrate the value of this principle by an extensive quotation from an old Privy Council decision condemning the conduct of a retrial on the basis of reading the notes of the witness' prior testimony.[29] However, the principle was deemed of diminished applicability in *Raddatz* because that case involved merely a suppression hearing, while the Privy Council's "admonition was made with reference to an appellate court's review of a *nisi prius* judge in a trial on the merits." *Id.* at 2414. Here we *are* dealing with a trial on the merits, and the Privy Council's admonition has full force. In such an instance, the one who decides must hear. And, in *Gomez*, in significant

part to avoid constitutional problems, *id.*, 109 S.Ct. 2241, the Court construed the Federal Magistrates Act as not authorizing magistrates to preside over jury *voir dire* in felony cases, even with *de novo* review by the district court. The *Gomez* Court noted in this connection, in language fully applicable to mere cold record *de novo* review of a trial on the merits, that "only words can be preserved for review; no transcript can recapture the atmosphere...." *Id.* at 2247. *See also United States v. De La Torre*, 605 F.2d 154 (5th Cir.1979).[30]

Accordingly, we construe Rule 9020 as prescribing the procedures by which such contempts as the bankruptcy court may otherwise have jurisdiction over are to be handled in and by that court and reviewed by the district court. But where the bankruptcy court does not otherwise have jurisdiction over the contempt proceeding—as we have held it does not in a section 401(3) criminal contempt prosecution for violation of a bankruptcy court order—Rule 9020 does not apply. Therefore, in such a case there is no authority for the bankruptcy court to conduct the trial. Rather, the proceedings should be governed by Fed.R. Crim.P. 42(b), and heard by the district court (or by that court and a jury). Rule 42(b) would appear to contemplate that the district court that decides the criminal contempt will hear the evidence and conduct the trial. Such an understanding of Rule 42(b) is reinforced when that rule is considered in light of the principle, recognized in *Raddatz*, that in criminal merits determinations the one who decides must hear, and the further principle, recognized in *Gomez*

---

**29.** The quotation as it appears in *Raddatz*, 100 S.Ct. at 2414, is as follows:

" 'The most careful note must often fail to convey the evidence fully in some of its most important elements.... It cannot give the look or manner of the witness: his hesitation, his doubts, his variations of language, his confidence or precipitancy, his calmness or consideration; ... the dead body of the evidence, without its spirit; which is supplied, when given openly and orally, by the ear and eye of those who receive it.' *Queen v. Bertrand,* 4 Moo.P.C.N.S. 460, 481, 16 Eng.Rep. 391, 399 (1867)."

**30.** In *De La Torre,* we reversed a conviction where, after the jury had retired, the magistrate,

following consultation with the trial judge, responded to a jury request for the portion of the charge dealing with conspiracy by rereading so much of the charge as specifically dealt with conspiracy, but refused defense counsel's request to also reread the definitions of "specific intent," "knowingly," and "willfully," because the foreman had indicated that the rereading of the conspiracy language satisfied the jury's inquiry. Without passing on the merits of what should or should not have been reread, we nevertheless reversed because "[i]t is the defendant's right to have an Article III judge rule on his counsel's objections and requests for instructions to the jury, at least absent waiver of that requirement by counsel." *Id.* at 155–56.

and *De La Torre*, that, absent waiver by the defendant, the conduct of all critical stages of criminal trials—and surely no stage is more critical than that of the live presentation and receipt of the evidence—must be before the judicial officer having jurisdiction to render the judgment of acquittal or conviction and sentence. And, *Gomez* teaches us that the right "to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside" is "[e]qually [as] basic" as the " 'right to an impartial adjudicator.' " *Id.*, 109 S.Ct. at 2248. Hence, we conclude that *de novo* district court review—and certainly where that review is wholly on the basis of the bankruptcy court trial record—is not a sufficient basis on which to predicate a section 401(3) criminal contempt conviction for violation of a bankruptcy court order, notwithstanding that the district court may purport to itself render the judgment of conviction and impose the sentence. On the contrary, such criminal contempts must be tried before the district court.

### Conclusion

The criminal contempt proceeding against Oles was conducted in violation of *Young* because it was prosecuted by an interested party rather than a disinterested representative of the public. Therefore the conviction and sentence are set aside, and the case is remanded to the district court. We instruct that the bankruptcy court not preside over the trial of any further prosecution of the alleged offenses. Bankruptcy courts have no inherent or statutory power—and none is granted them by 11 U.S.C. § 105 or by 28 U.S.C. § 157 or by Rule 9020—to preside over section 401(3) criminal contempt trials for violation of bankruptcy court orders or to acquit, convict, or sentence for such offenses. Not only must the acquittal or conviction and sentence for such offenses be by the district court, but all critical stages of the trial of such offenses must likewise be before that court.

REVERSED and REMANDED.