**NOVELTY TEXTILE MILLS, INC., Petitioner,**

v.

**Steven STERN and Toni Garment, Respondents.**

**No. 86 Civ. 0362 (BN).**

United States District Court, S.D. New York.

March 26, 1991.

Steven J. Mandelsberg, Hahn & Hessen, New York City, for petitioner.

Herbert Adler, Adler, Klein & Liss, New York City, for respondents.

## OPINION AND ORDER

BARBARA A. LEE, United States Magistrate Judge.

A special proceeding brought by Novelty Textiles, Inc., pursuant to §§ 5225(b) and 5227, N.Y.Civ.Prac.L. & R., against the shareholders of a judgment debtor was tried before me on consent of the parties pursuant to 28 U.S.C. § 636(c). Judgment in favor of the petitioner in the amount of $203,491.23 was thereafter duly entered. During the trial, respondents moved to amend the Consent Pretrial Order to assert the defense of lack of jurisdiction of the subject matter. After an evidentiary hearing on the existence of diverse citizenship, the motion was denied and respondents' attorney was held to have violated 28 U.S.C. § 1927 by making it. After successive adjournments requested by each of the parties, a hearing was eventually held on issues of fact bearing on sanctions and decision reserved. For the reasons discussed below, respondents' attorney, Herbert Adler, Esq., is directed to pay to petitioner Novelty Textiles, Inc. the amount of $2,000.00 and to the Clerk of the Court the amount of $250.00.

## BACKGROUND

On October 11, 1985, judgment in the amount of $144,137.98 was entered in favor of Novelty Textiles, Inc. ("Novelty") against Bottoms Sportswear, Inc. ("Bottoms"), confirming an arbitration award arising out of a commercial contract. *Novelty Textile Mills, Inc. v. Bottoms Sportswear, Inc.*, No. 85 Civ. 5287 (S.D.N.Y. filed October 11, 1985). When the judgment proved uncollectible (Bottoms having ceased operations), Novelty on January 9, 1986, commenced a special proceeding in

aid of enforcement of the judgment by filing a petition against the stockholders of Bottoms, Steven Stern and Toni Garment, pursuant to Rule 69(a), Fed.R.Civ.P., and §§ 5225(b) and 5227.[1] The next four years were consumed by a variety of discovery disputes and other matters, most of which are not here relevant. The Consent Pretrial Order filed September 14, 1987, stipulated that "there is no dispute concerning jurisdiction or venue." [2] On November 30, 1989, the parties' consent to trial before a United States Magistrate pursuant to 28 U.S.C. § 636(c) was filed, and the case was assigned pursuant to the "blind" case assignment procedures in effect in this district.[3] A pretrial conference was held on December 7, 1989, principally for the purpose of setting a date for trial. Neither party sought any amendment to the Consent Pretrial Order previously filed. Counsel estimated that the trial would require approximately four days, and a scheduling order was thereafter entered on December 11, 1989.

1. Rule 69(a) provides in pertinent part:

    The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable.

    CPLR § 5225(b), the section on which Novelty prevailed, provides:

    Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor ...

2. Respondents were originally represented by other counsel, who signed the Consent Pretrial Order. It is unclear when the attorney who is the subject of this opinion came into this case, since the Clerk's Docket Sheet reflects neither a notice of appearance nor an order of substitution. *See* Local General Rule 3(c); Local Civil Rule 1(b).

The non-jury trial took place on December 18, 19, 20, 21, 26 and 27, 1989. Findings of fact and conclusions of law were read into the record in open court on January 30, 1990, and the entry of judgment against Stern and Garment pursuant to Rule 54(b), Fed.R.Civ.P., expressly directed (tr. 1456–57).[4] Judgment for petitioner Novelty in the amount of $203,491.23 (including interest) was thereafter duly entered by the Clerk.

The trial began with a dispute over a subpoena served by respondents calling for records of Novelty for the period 1980–85, including tax returns, not listed as respondents' exhibits in the Consent Pretrial Order (tr. 3–23).[5] Novelty then called its president, Arthur Feinberg, whose brief direct testimony described the nature of Novelty's business and summarized the history of its dealings with Bottoms; the dispute leading to the arbitration; and Novelty's inability to collect the judgment (tr. 49–64).[6]

3. The term "United States Magistrate" or "Magistrate" is used throughout this opinion, since the change of title to United States Magistrate Judge, Pub.L. No. 101–650, § 321, eff. December 1, 1990, 101st Cong., 2nd Sess., 1991 U.S.Code & Cong.Admin.News (104 Stat.) 5117, had not occurred at the time of the proceedings here described.

4. References to "tr." are to the transcript of the trial held in December, 1989; references to "hg. tr." are to the transcript of the hearing on sanctions held in July, 1990.

5. Respondents' attorney stated that the documents were needed for impeachment in connection with the cross-examination of Novelty's president (tr. 4–5). Novelty contended that the subpoena was a disguised attempt to relitigate previous discovery rulings adverse to respondents (tr. 5–9), with which respondents' counsel professed to be unfamiliar (tr. 11), and that the material called for was irrelevant (tr. 6; 15–17). The documents were sent to court by Federal Express the next morning, and held in the custody of petitioner's attorney or the Deputy Clerk "until such time as [respondents' attorney] indicates that he needs access to any of them for the purpose of cross-examination or whatever purpose" (tr. 18–23).

6. Mr. Feinberg was not asked on direct to state where he resided. He testified as follows concerning the location of Novelty's business:
Q  Where does Novelty maintains [sic] its place of business?

Respondents' attorney commenced his cross-examination of Novelty's president with a series of questions going to the location of Novelty's principal place of business for diversity purposes (tr. 67–70). After argument on Novelty's objection to this line (tr. 70–74), respondents' attorney was directed to confine his questioning to issues raised by the Consent Pretrial Order, subject to his right to make a motion the next morning "consistent with Rule 11" for an order amending it (tr. 74–75).

Following that ruling, respondents' attorney sought "to continue to inquire into the concept of the apartment" maintained by Novelty on the theory that it was relevant not to jurisdiction but to the issue whether *Bottoms'* payment of respondent Garment's rent was a transaction violative of § 5225(b) (tr. 75–77). Instructed to confine his cross-examination to the scope of the direct examination (tr. 76), respondents' counsel continued with a series of questions concerning the locations at which business contacts between Bottoms and Novelty occurred (tr. 77–82). The balance of his cross-examination dealt with the underlying dispute that led to the arbitration proceeding (tr. 82–93) and the witness' understanding of the dates of the alleged transfers by Bottoms to respondents which were the subject of this special proceeding (tr. 93–98). The presentation of Novelty's case then continued (tr. 101–173).

The next morning, December 19, respondents' attorney made a motion to amend the Consent Pretrial Order to raise the defense of lack of jurisdiction of the subject matter, based on "newly discovered evidence" in the form of testimony elicited from Mr. Feinberg during cross-examination concerning a corporate "place" in Yonkers, New York, used by him while in New York City on business (tr. 246–48; *compare* tr. 69–70). In support of the motion, counsel made the following offer of proof:

> Your Honor, I intend to show that Novelty Textiles is in the business of selling textile fabrics to the garment manufacturing trade, that the sender [sic; center] of that activity is located in the City of New York, that Novelty Textiles maintains an office in the heart of the garment district in the center of the garment district, 1440 Broadway, corner of Broadway and 40th Street, centrally located to where most of its customers are and *where all or virtually all of its sales are made*, that its chief executive and for all intents and purposes sole shareholder—he may have other family members who are shareholders—that the chief executive officer, director and virtual sole shareholder, Mr. Feinberg, *spends most of his time in the New York office*, that he maintains a place of residence in close proximity to that office, *that the income of Novelty Textiles is derived from its activities located in New York* and most approximately resultant [sic; probably should read "proximately result"] from the activities located in New York, that it maintains at best a secondary location being its manufacturing plant in the northeast corner of Connecticut close to the Massachusetts/Rhode Island borders, that this is a manufacturing plant where textiles are fabricated, put together, woven, warped, whatever, but that that is not the nerve center or principal place of operation of this textile business.

> \*  \*  \*  \*  \*  \*

> Novelty Textile maintains its own manufacturing plant in Connecticut, that *Mr.*

A   Main place of business is in Wauregan, Connecticut; that is where the factory and offices are. We maintain a sales office—
THE COURT: Wauregan?
THE WITNESS: Yes. W–A–U–R–E–G–A–N. That is in the northeast corner of the state.
A   (Continuing) we maintain sales offices in 1440 Broadway, New York City.
Q   Could you elaborate a little bit on what is actually done at the Wauregan, Connecticut facility.

A   All of the manufacturing is done in Wauregean [sic], Connecticut, all of the invoicing, all of the keeping of the books and records is done in Wauregean [sic], Connecticut with the exception of those that are done by the accountant who is in Great Neck, New York, Long Island (tr. 50–51).

*Feinberg,* its principal officer, maintains a secondary residence in Connecticut, *spends most of his time in New York,* the decisions are made from New York City, the sales are made from New York, the corporation maintains an accountant for its books and records in Great Neck, New York, files its income tax returns from the State of New York, files *New York State and New York City income tax returns showing that the major part of its income is derived from its activities in the State of New York.*

I also intend to show that it maintains its bank accounts in the State of New York, that it maintains its records in the State of New York, itself and through its accountants in Great Neck, New York [tr. 256–59, emphasis added].

Asked what evidence he intended to offer on these issues, respondents' attorney first stated only that "I intend to offer the tax returns of the corporation" (tr. 260). He then went on to represent that he would [i] move to amend the pretrial order further in order to "[s]ubpoena an employee who is a full-time employee located in the 1440 Broadway office to testify as to the amount of Mr. Feinberg's presence there and the activities that are conducted there" (*id.*); [ii] recall Novelty's president; [iii] examine Novelty's expert accounting witness; and [iv] offer "[t]he corporate minutes, Certificate of Incorporation and Certificate of Authority, if any, for · doing business which are contained in the Subpoena" (tr. 260–62).[7] Finally, respondents' attorney referred to the possibility that evidence resulting from his "researching the deed" and a "litigation search" then being conducted at his direction might be offered;

"[i]t depends what is discovered" (tr. 262–63).

Decision on the motion to amend the Consent Pretrial Order was reserved and respondents' counsel was directed to submit, by 9:30 a.m. the next day, a list of the witnesses and exhibits proposed to be called, the specific provisions of the Consent Pretrial Order proposed to be amended and an affidavit setting forth the reasons the proffered evidence "was not available or could not reasonably have been available in order to raise this defense in a more timely fashion" (tr. 263–64). Although, as respondents' attorney correctly pointed out, subject matter jurisdiction is never waived, the issue was the distinction between newly discovered evidence and "a new bite at the apple" by successor counsel (tr. 250; *see also id.* at 253–54).

On the morning of December 20 (the third trial day), counsel's affidavit was served and handed up.[8] It recites the execution of the Consent Pretrial Order by predecessor counsel "[b]ased upon the representation of petitioner *and* its counsel with respect to the issue of petitioner's citizenship";[9] the "substitu[tion]" of "deponent and his firm ... as attorneys of record for respondents" in approximately April of 1989;[10] and the fact that "deponent's office is located at 1440 Broadway, New York, New York, the same building in which petitioner maintains an office."[11] It goes on to characterize the testimony of Mr. Feinberg concerning his place of residence and the "disclos[ure]" that certain corporate records were in the possession of an accountant in New York.[12] The key

7. The reference is to the subpoena discussed in Note 5, above. Certain of the documents called for by the subpoena were in the courtroom at the time of the offer of proof, but had not yet been made available to respondents' attorney.

8. Although the Affidavit of Herbert Adler sworn to December 20, 1989 ("Adler Aff."), is shown on the Clerk's Docket Sheet as having been filed on December 21, 1989, it · could not thereafter be located among the papers on file. After an extensive but unsuccessful search by the Clerk's Office, a copy which both counsel agreed was accurate was supplied by counsel on March 20, 1991. The document supplied, together with the

correspondence that accompanied it, is being sent to the Clerk simultaneously herewith, with directions that they be filed.

9. Adler Aff. ¶¶ 5–7 (emphasis in original).

10. *Id.* ¶ 8. As noted above, no order of substitution is reflected on the Clerk's Docket Sheet.

11. *Id.*

12. "9. Deponent is aware of the standards adopted by the Second Circuit for determining a corporations principal place of business and thereby its citizenship. By virtue thereof depo-

arguments concerning the nature of "newly discovered evidence" and the reason for the timing of the challenge to jurisdiction are stated in ¶¶ 13 and 14:

13. These two facts which came to light for the first time at trial, coupled with the known location of an office in New York (which alone would not necessarily be sufficient to predicate New York citizenship) became significant enough to arouse my suspicion and give reasonable grounds upon which it would be appropriate to conduct a further inquiry into *bona fides* of the representations of petitioners principal and its counsel on the issue of subject matter jurisdiction.

14. I believe that the issue is timely raised based upon the surprise disclosures made at trial.

The balance of the affidavit consists of legal argument.[13]

Following oral argument (tr. 504–69), the motion to amend the Consent Pretrial Order was granted to the limited extent that respondents were permitted to offer evidence on "whether the Petitioner corporation had its principal place of business in New York at the time this special proceeding was commenced" (tr. 579–80). Evidence on that issue as well as on the question "whether the evidence offered in support of that contention is newly discovered and why it was not raised at the time of the Joint Pretrial Order and why it was not raised at the final pretrial conference" was scheduled to be heard at the outset of respondents' case (tr. 580–81). Counsel were advised that the trial would continue on Friday morning, December 22 and again on Tuesday, December 26 if, by virtue of the introduction of the additional issue, it could not be completed in the four days originally contemplated (tr. 582–88).

Novelty rested on the afternoon of the same day and the hearing on respondents' motion to dismiss for lack of subject matter jurisdiction commenced (tr. 670–721). It continued on the following day and, including oral argument, consumed the entire morning session (tr. 727–859). Respondents' evidence consisted almost entirely of the testimony of Novelty's president and corporate documents and tax returns introduced through him (tr. 670–719; 727–800). The only other witness called was respondent Toni Garment, who testified only as to the size of Novelty's sales office in New York (tr. 801–03). None of the other evidence outlined in respondents' offer of proof was offered: neither Novelty's accounting expert nor a "full-time employee located in the 1440 Broadway office" was called; nor did respondents offer any documentary evidence relating to the Yonkers property.

nent was aware that an important element of that standard is, *inter alia,* the location of principal of the corporation in determining the situs of the 'home office' or 'nerve center' of the corporation. Until the trial and the testimony of Mr. Feinberg thereat, deponent was under the impression that Mr. Feinberg, the principal of the corporation resided in the State of Connecticut, in close proximity to the address of the corporation in that state and that he resided there so that he could be physically close to his company's nerve center.

"10. At trial, on cross examination, Mr. Feinberg continued to maintain, under oath that he was a resident of Connecticut but then, on probing, disclosed that he *also* had an address in New York which somehow was maintained by the corporation. My first impression was that this would most likely be an apartment in the City of New York which would be used by Mr. Feinberg to accommodate overnight stays while away from the corporation's primary location in the northeastern corner or Connecticut and for convenience in his visits to the local office.

"11. I asked the witness for the address of this facility. I was surprised when he responded that the address was 520 Westchester Avenue, Yonkers, New York. This was *not* an apartment in Manhattan as I would have expected. But more importantly, by coincidence, I was intimately familiar with the location, having resided within a few blocks of that address for some 15 years. This was not an apartment but a private house of some substance and certainly not the type of residence for a corporate executive away from the 'home office' of his business.

"12. In addition, there had been some colloquy at the state of the trial with regard to the subpoena of certain records. It was disclosed in that discussion that the corporate records sought by the subpoena were in the possession of the corporate accountant who was not located in Connecticut, where the principal place of business was *alleged* to be but in New York" (emphasis in original).

13. *Id.* ¶¶ 15–21.

Nor did the evidence that was offered conform to counsel's offer of proof. Of all the facts summarized in counsel's proffer (tr. 256–59, quoted above, pp. 67–68), the only ones actually proved were that Novelty maintained a sales office in New York, estimated by respondent Garment to occupy "1800 to 2000 square feet" (tr. 802); and that it used a New York address on its tax returns. These details were outweighed by all of the other evidence tending to show that Novelty's principal place of business was Connecticut. Neither Feinberg's testimony nor the corporate tax returns tended to show that "all or virtually all of [Novelty's] sales are made" at 1440 Broadway; "that the income of Novelty Textiles is derived from its activities located in New York;" that Mr. Feinberg "spends most of his time in New York" or that Novelty "files New York State and New York City income tax returns showing that the major part of its income is derived from its activities in the State of New York" in accordance with counsel's proffer (tr. 256–59, quoted above, pp. 67–68). The evidence, as discussed in detail in the decision denying the motion to dismiss (tr. 859–71), showed precisely the contrary.

Respondents' motion was denied on the ground that the evidence showed Novelty to be a citizen of Connecticut for purposes of diversity jurisdiction (tr. 863–871). That conclusion was in turn based on the specific findings of fact, among others, that Novelty's New York office was a sales office (tr. 865) and that, based on the tax returns offered in evidence by the respondents, approximately 51% of Novelty's income was allocable to Connecticut, compared to 15.25% allocable to New York (tr. 870).

It then became necessary to consider the applicability of § 1927 (tr. 871–878). The conclusion that respondents' attorney violated that section was based on the specific findings (1) that the facts stated in the attorney's affidavit sworn to December 20, 1989, were "insufficient to warrant a finding that this motion to amend the Pretrial Order to raise the issue of subject matter jurisdiction was based on newly discovered evidence" (tr. 874); that "the record that has been made on this jurisdictional issue makes very clear that at the time the objection to subject matter jurisdiction was first raised during this trial it was not based on reasonable inquiry, it was not well-grounded in fact and it was not warranted by existing law" (tr. 875) but was "based on what turns out to be nothing more than speculation" (tr. 874–75); that "instead of offering evidence in support of his contention that [Novelty] had a principal place of business in New York, [respondents' counsel] proceeded to conduct discovery by his questioning of Mr. Feinberg and proceeded to advance arguments unsupported by law and fact" (tr. 875); and that "this frivolous motion, which has taken the time of Court and counsel for nearly two full days, is exactly what Congress had in mind when it chose that very vivid language of section 1927" (tr. 877).

On the sixth trial day, after both parties rested, a schedule was set for the submission of papers relating to the § 1927 issues. Novelty's attorneys were directed to submit proof of expenses incurred as a result of the motion by January 12, 1990. Respondents' attorney was given until January 19, 1990, to submit opposing papers and to request a hearing on any issues of fact bearing on sanctions. The hearing was scheduled for January 26, 1990 (tr. 1205–08) and counsel were advised that the issues relating to sanctions would be ruled on on January 30, 1990, simultaneously with announcement of the decision on the merits (tr. 1197; 1209–10).

Novelty thereafter requested an extension of time to file its proof of expenses, which required an adjournment of the January 26 hearing to March 6, 1990. The hearing was adjourned for a further four months when respondents' attorney suffered a serious automobile accident, and finally took place on July 5 and 6, 1990. Meanwhile, Novelty filed an affidavit of its attorney Steven J. Mandelsberg, Esq., sworn to January 19, 1990, claiming attorneys' fees in the amount of $6,415.50 and expenses of $125.00 attributable to "defending against Respondents' jurisdictional challenge," as well as expenses attributable to the fee application and the sanctions

hearing (Mandelsberg Aff. ¶¶ 9–11). Thereafter, Novelty's counsel claimed an additional $9,858.75 incurred between January and July, 1990, exclusive of attendance at the sanctions hearing (*see* hg. tr. 285).

Respondents' attorney testified at the hearing that he was consulted in April or May, 1989, about replacing respondents' then counsel and was retained solely for the purpose of trial (hg. tr. 157–59); that he reviewed the prior pleadings, the discovery and the Consent Pretrial Order; that he "relied" on counsel who signed the Consent Pretrial Order (hg. tr. 160; 161; 163–64; 206–07; 225); and that based on that review he "did not believe that I had a colorable basis in law or fact to challenge the subject matter jurisdiction of this Court" (hg. tr. 214). On the first day of trial, however, his "litigator's instinct" was aroused by Mr. Feinberg's testimony that he resided in Groton, Connecticut and that Novelty maintained a residence for him in Yonkers, New York (hg. tr. 215). Based on his personal knowledge of the "type of dwellings" in the neighborhood where the corporate property was located, as well as conversations with his mother and brother, he concluded that Mr. Feinberg resided in Yonkers, not Groton; that he therefore spent most of his time in Novelty's New York office rather than at its facility in Wauregan, Connecticut; and that the New York office must therefore be the "principal" office for diversity purposes (*see, e.g.,* hg. tr. 163–73; 175; 195–97; 215; 224; *see also id.* at 306–19 (oral argument)). Although he was aware that the Consent Pretrial Order stipulated that Novelty was a Connecticut corporation (hg. tr. 163–64), he testified that he "learned for the first time on the 18th [of December] that the plant or the facility that Novelty claimed to be its principal place of business in Connecticut was a plant located in Wauregan, Connecticut...." (hg. tr. 174).[14] He fur-

ther testified that he did not begin the line of questioning about Mr. Feinberg's residence with the intention of attacking subject matter jurisdiction (hg. tr. 170), but that after the issue "was raised," it was his "suspicion" that Novelty's tax returns "would show a New York address" (hg. tr. 181). He testified that his original reason for the subpoena was that he "intended to use Novelty's own tax returns to show that Novelty's principal engaged in the same kind of corporate loan interaction as Stern and Garment had" because he "believed this to be a common practice" in the industry (hg. tr. 221) and "was willing to bet that Novelty engaged in the same practice" (hg. tr. 222); but that

> [w]hen we got on to the subject matter jurisdiction issue, I believed that the tax returns, the addresses on the tax returns would be relevant data and information to that inquiry.
>
> I had no opportunity to do pretrial discovery in the middle of trial and I did the best I could by utilizing the documents that had been subpoenaed for a different purpose [hg. tr. 221].

On the basis of "those bits of information," respondents' attorney testified that he

> believed and felt I had an obligation as an officer of this Court to bring to the Court's attention the possibility that this Court lacked subject matter jurisdiction, and I believed at the time that a fraud might be about to be perpetrated upon the Court.... [hg. tr. 215–16].

Notwithstanding the adverse ruling at trial, respondents' attorney testified that he conducted "subsequent investigation" which led him to "believe even more strongly that Mr. Feinberg committed perjury and that there was very possibly a fraud committed on this Court in maintaining subject matter jurisdiction" (hg. tr. 218).[15]

---

14. Paragraph 2 of the Consent Pretrial Order stipulated: "At all times material, petitioner was and still is a Connecticut corporation maintaining principal offices and a place of business at Route 12 and Shepard Hill Road, Wauregan, Connecticut."

15. Respondents' attorney testified that his "subsequent" investigation revealed that Mr. and Mrs. Feinberg hold New York State drivers' licenses listing the address of the house owned by Novelty, and that Mr. Feinberg "drives a late model Lincoln that is registered in the State of

During oral argument, respondents' attorney explained in greater detail how he believed the evidence relating to Mr. Feinberg's place of residence provided a basis for his motion challenging jurisdiction:

> Your Honor, I discovered that the principal maintained a residence in New York, a substantial residence that in my mind, knowing the area, was in the nature of a primary residence-type dwelling; that the area of Groton or Mystic Connecticut was in the nature of a resort area and a beach house, leading me to believe that the primary residence was in New York. I had seen Mr. Feinberg on numerous occasions in the elevators because of the way the elevator banks are set up.
>
> THE COURT: Didn't you tell me you didn't know Mr. Feinberg?
>
> MR. ADLER: When I saw him in the courtroom I recognized his face as someone I saw frequently in the building. That's in my affidavit of December 20. I was surprised when he said Groton, Connecticut. How did he commute two hundred miles?
>
> THE COURT: But you're assuming he commuted two hundred miles.
>
> MR. ADLER: It was an irrational assumption. I assumed he didn't do it, which led me to the next question, 'Do you have a place of residence in New York,' at which point I observed him look down and give evasive-type glances which were things that indicated to me that a witness was having trouble with an answer [hg. tr. 308–09].[16]

It was also during oral argument at the conclusion of the sanctions hearing that counsel stated for the first time what it was that he found suspicious about Mr. Feinberg's testimony: his theory, not previously adverted to at trial, in his December 20 affidavit or in his sworn testimony at the sanctions hearing, was that

Mr. Feinberg has adopted a tax life in which he claims to be a Connecticut residence [sic] for the purpose of taxation and state taxation, that he finds that that is more advantageous and therefore for some purposes he lists Connecticut as his principal residence and for other purposes he lists New York as his principal residence, an ambiguous situation at best [hg. tr. 309–10].

Although no questions were asked of Mr. Feinberg on any of the facts assumed in the quoted portion of counsel's argument, this theory is apparently the basis for the charge, advanced for the first time at the sanctions hearing, that Mr. Feinberg committed perjury at the trial (hg. tr. 218, quoted above, p. 71).

## DISCUSSION

### I. *Violation of § 1927*

■ 28 U.S.C. § 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

The purpose of the statute is "to deter unnecessary delays in litigation." H.R. Conf.Rep. No. 1234, 96th Cong., 2d Sess. 8, 1980 U.S.Code Cong. & Admin.News 2716, 2782 (quoted in *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987)).[17] Unlike Rule 11, Fed.R.Civ.P., which imposes an objective standard, *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 253–54 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) (*"Eastway I"*), § 1927

---

New York to Novelty Textile Mills" at the same address (hg. tr. 198).

16. Mr. Adler's characterization of Mr. Feinberg's demeanor does not comport with my own observation of this witness at trial. *See* tr. 248. The reference to the "affidavit of December 20" is also inaccurate. *See* Adler Aff. ¶¶ 9–11, quoted in full above, note 12.

17. The 1980 amendment authorized the award of attorneys' fees pursuant to § 1927, which had previously been construed as limited to "costs," *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980). The "sparse legislative history" of § 1927 prior to 1980 is discussed in *Roadway Express,* 447 U.S. at 759–61, 100 S.Ct. at 2460–61.

"requires a 'clear showing of bad faith.' " *Oliveri*, 803 F.2d at 1273 (quoting *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1010 (2d Cir.1986)). A finding of bad faith is amply supported by this record.

Counsel's self-serving testimony that the two days spent on his challenge to jurisdiction were a good-faith effort to fulfill his obligations to the court is totally unworthy of belief. Counsel's affidavit seeking leave to make the motion on the ground of "newly discovered evidence" was in fact based not on any "evidence" at all—whether newly discovered or otherwise—but on counsel's admitted "suspicion," on the basis of which he wanted to conduct "further inquiry." Adler Aff. ¶ 13, quoted above, p. 69. It is abundantly clear that the offer of proof on the basis of which counsel was permitted to proceed with his motion attacking jurisdiction had no objective basis in fact. Construing the record most favorably to respondents' counsel, his offer of proof was, at best, an outline of the issues he intended to explore in the hope that some evidence would turn up.[18] Toward that end, he called Novelty's president, ostensibly as a hostile witness, (tr. 671), for what amounted to discovery on the issue of jurisdiction. While exploring a number of other topics to no relevant purpose (tr. 671–719), counsel never asked the witness how much time he spent in New York; whether the residence in Yonkers was a house or an apartment; whether his residence in Groton was a vacation home or what residence address appeared on his personal tax returns. Yet he argues, based on his personal "knowledge" and "investigation" of facts that were never offered in evidence, that a fraud was perpetrated on the court and at the sanctions hearing went so far as to accuse Mr. Feinberg of perjury on matters about which he was never asked.

These inconsistencies and implausibilities in counsel's testimony, coupled with my observation of his conduct at the trial and his demeanor at the sanctions hearing, support a finding that the real purpose of his motion to dismiss for lack of jurisdiction was to prolong the proceedings and thus postpone the inevitable day when a judgment might be entered against his clients. This inference is further supported by the other dilatory tactics in which counsel engaged throughout the trial, and the frivolous positions he persists in arguing even now.

The events of the afternoon session on December 21 illustrate the approach taken by respondents' attorney throughout the trial. Immediately after the issue of jurisdiction had been resolved in petitioner's favor (tr. 879), respondents' attorney called as his next witness on the merits one Milton Cohen, whom he proposed to question as both a fact witness and an expert witness (tr. 885–86). The Consent Pretrial Order recited that respondents intended to call only themselves as fact witnesses and one Kenneth Larsen as an expert (¶¶ 12(2), 13(2)). When petitioner objected, respondents' attorney argued among other things that he had not "prepared or signed" the Consent Pretrial Order (tr. 882). On the basis of the representation by respondents' attorney that Cohen was "primarily being called as a fact witness because he was the accountant who actually worked on the books at the time" (tr. 885), respondents were permitted to call Cohen as a fact witness, subject to petitioner's right to move to strike on certain conditions (tr. 885–88). When it appeared on direct examination that, contrary to counsel's represen-

---

18. The content of Novelty's tax returns, which were so damaging to respondents' contention, are but one example of counsel's consistent recklessness in predicting the content of documents he had not seen. Another occurred when counsel stated that he intended "to show that [Novelty] maintains its bank accounts in the State of New York ..." (tr. 259, quoted above, p. 68). The sum total of the evidence offered on that issue was the following testimony of Mr. Feinberg:

Q Isn't it a fact that Novelty Textile Mills maintains a bank account in the City of New York?
A That is not correct.
Q It maintains no bank account in the City of New York?
A No bank account in the City of New York.
Q No bank account in the State of New York?
A No bank account in the State of New York.
Q This was true in 1986?
A This was true in 1986 [tr. 686].

tation, Cohen in fact had no personal knowledge of Bottoms' books and records, respondents' counsel moved to amend the Consent Pretrial Order to add him as an expert witness (tr. 909). After the motion was denied (tr. 917), counsel nevertheless proceeded to question the witness concerning his expert opinion on matters of which he had no personal knowledge (tr. 919–25). When objections to those questions were sustained, he proceeded to offer an exhibit not listed in the Consent Pretrial Order, admittedly as "another way to try to elicit the same information" (tr. 933). These activities having consumed the balance of the afternoon, respondents' counsel announced for the first time at 4:22 p.m. on December 21 that neither of his clients, who were his only remaining witnesses, would be able to be in court on the morning of December 22 because of personal travel plans (tr. 934–35).

The attitude evidenced at trial has persisted through the instant proceeding. Significantly absent from counsel's argument that he should not be sanctioned is any recognition of the lack of merit in his motion attacking jurisdiction. Rather, he appears to argue that because the issue of subject matter jurisdiction may be raised at any time, the challenge need not be meritorious (*see* Resp.Mem. at 15).[19] Having requested a hearing on the issue of bad faith,

he argues in his pre-hearing brief that there has been no finding of bad faith (Resp.Mem. at 17; 23–24). Finally, he asserts that the court is "estopped" from imposing sanctions (Resp.Mem. at 15; *see also* tr. 323) and that there was no "multiplication" within the meaning of § 1927 because the "issue of subject matter jurisdiction was raised but once" (Resp.Mem. at 14). These frivolous arguments only reinforce the inference that the motion was made in bad faith for no purpose except delay.

## II. *Magistrates' Power to Impose Sanctions Under § 1927*

■ Respondents' attorney argues that United States Magistrates, notwithstanding the power to order the entry of judgment in consent cases pursuant to 28 U.S.C. § 636(c), have no power to impose sanctions under 28 U.S.C. § 1927. He argues that § 1927 is limited to a "court of the United States" (Resp.Mem. at 21–23)—*i.e.*, to Article III judges.[20] Section 1927, however, authorizes the imposition of sanctions "by the court" without any modifier.[21] In contrast, when Congress has created powers intended to be exercised only by Article III judges, it has expressly used the phrase "court of the United States," as in 28 U.S.C. § 451 (criminal contempt). Thus it

19. Counsel's affidavit seeking leave to make the motion on the ground of "newly discovered evidence" appears to reflect the same misconception. *See* Adler Aff. ¶ 21, in which counsel argues that this doctrine "require[s]" the grant of the motion, while in the same sentence making clear that his intention is not to prove facts that would defeat jurisdiction, but merely "to inquire upon the trial as to the issue of such jurisdiction." The ritual invocation of the principle that subject matter jurisdiction is never waived does not authorize the re-opening of discovery in the midst of trial based on speculation.

20. *See* 28 U.S.C. § 451, which provides in pertinent part:
The term 'court of the United States' includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good behavior.

21. The reference in § 1927 to an "attorney ... admitted to conduct cases in any court of the United States or any Territory thereof" does not require that "court" be read to mean "court of the United States." Indeed, such a reading would render meaningless the reference to attorneys admitted to practice before Territorial courts which, in Chief Justice Marshall's memorable formulation, are "legislative courts," not "constitutional Courts in which the judicial power conferred by the Constitution on the general government, can be deposited...." *American Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828), and whose judges, unlike Article III judges, therefore are not protected against removal from office "during good behavior," *McAllister v. United States*, 141 U.S. 174, 186, 11 S.Ct. 949, 953, 35 L.Ed. 693 (1891), in the absence of specific legislation, *see, e.g.*, 28 U.S.C. §§ 119, 451 (Puerto Rico); *see generally* 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3528 (1984); 17 *id.* § 4107 (1988).

is significant that, while Congress expressly withheld the contempt power from Magistrates, even in consent cases, *see* 28 U.S.C. § 636(e), there is no comparable exception to § 1927.

■ The withholding of contempt powers has been held to be crucial to the Constitutionality of the exercise of dispositive powers on consent by both Magistrates, *e.g., Geras v. Lafayette Display Fixtures, Inc.,* 742 F.2d 1037, 1044 (7th Cir.1984), and Bankruptcy Judges, *e.g., In re Hipp, Inc.,* 895 F.2d 1503 (5th Cir.1990). There is no similar Constitutional barrier to the entry of sanctions orders under § 1927. On the contrary, pecuniary sanctions are not "dispositive" orders and may therefore be entered by Magistrates, even in the absence of consent, pursuant to the power to "hear and determine" conferred by § 636(b)(1)(A). *See, e.g., Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990) (Rule 37); *Maisonville v. F2 America, Inc.,* 902 F.2d 746, 748 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 674, 112 L.Ed.2d 666 (1991) (no material distinction between Magistrate's power to sanction under Rule 37 and Rule 11); *Bergeson v. Dilworth,* 749 F.Supp. 1555, 1561–62 (D.Kan.1990) (rejecting argument that sanctions motion is dispositive); *cf. In*

*re Usoskin,* 56 B.R. 805, 807 (E.D.N.Y. 1985) (sanctions imposed by Bankruptcy Judge under § 1927 and Rule 11 pursuant to 28 U.S.C. §§ 157(a), (b)(2)(I) and (J)). Nor is an order pursuant to § 1927, as respondents' counsel argues, "an order in the nature of a contempt." [22] Judicial power to award monetary sanctions "springs from a different source" than the contempt power and the requirements of due process are less stringent. *Warshay v. Guinness PLC,* 750 F.Supp. 628, 640 (S.D.N.Y.1990) (Rules 11 and 56(g), Fed.R.Civ.P.); *see also Oliveri v. Thompson,* 803 F.2d at 1273 (relationship between § 1927 and inherent power of court).

Our research has discovered no authority for reading into either § 1927 or § 636(c) a restriction of which Congress made no mention when expressly denying the contempt power to Magistrates pursuant to § 636(e).[23] A construction of § 1927 which deprived Magistrates of the power to sanction in § 636(c) cases that they exercise in pretrial proceedings pursuant to § 636(b)(1)(A) would be irrational. It would also be a peculiar anomaly in light of the power to impose § 1927 sanctions exercised by Bankruptcy Judges, whose powers resemble those of Magistrates more closely than those of any other non-Article III judicial officers.[24] Finally, such a reading

---

**22.** Hg. tr. 329. No authority is cited for this proposition (which is not argued in respondents' attorney's brief) and our own research has discovered none.

**23.** While reasoning from Congressional silence should be undertaken with caution, it should be noted that Congress had an obvious opportunity to deny Magistrates the power to sanction violations of § 1927 when that section was amended in 1980 to permit the award of attorneys' fees in addition to costs. Pub.L. No. 96–349, 96th Cong., 2d Sess., 1980 U.S.Code Cong. & Admin. News 2716. Section 636(c), permitting Magistrates to enter dispositive orders on consent of the parties, had been enacted by the previous session of the same Congress, Pub.L. No. 96–82, 96th Cong., 1st Sess., 1979 U.S.Code Cong. & Admin.News, 1469, and its Constitutionality had not yet been determined by any Court of Appeals.

**24.** Bankruptcy Judges have power to "hear and determine" in "core" proceedings, 28 U.S.C. § 157(b), analogous to Magistrates' power to "hear and determine" non-dispositive pretrial

matters under § 636(b)(1)(A); a District Judge may refer non-core proceedings to a Bankruptcy Judge for recommended decision pursuant to 28 U.S.C. § 157(c)(1), just as a District Judge may refer dispositive matters to a Magistrate pursuant to § 636(b)(1)(B) and (C), in each case subject to *de novo* review by the District Judge; finally, Bankruptcy Judges may enter final judgment in non-core cases on consent of the parties pursuant to § 157(c)(2), a provision which Congress modelled on § 636(c). *See generally In re Davis,* 899 F.2d 1136 (11th Cir.), *cert. denied,* —— U.S.——, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990); *In re Hipp,* 895 F.2d 1503; *In re Nanodata Computer Corp.,* 52 B.R. 334, 340–41 (W.D.N.Y.1985), *aff'd,* 74 B.R. 766 (W.D.N.Y.1987), discussing the analogy between the statutory powers of Bankruptcy Judges and Magistrates, and the similar rationale for the constitutionality of the exercise of those powers. Respondents' attorney, recognizing the similarity of powers conferred, argues in his brief that Magistrates may not impose sanctions pursuant to § 1927 because "at least one court has held that a Bankruptcy Judge does not have authority to impose attor-

would be inconsistent with the purposes of both § 1927, discussed above, Part I, and § 636(c), which was to improve access to the federal courts by expediting civil litigation.[25] Those important objectives would be seriously disserved by a construction making § 636(c) a "safe haven" for abuse of the judicial process.

There are few reported decisions involving the imposition or denial of sanctions by Magistrates under § 1927, and none that our research has discovered which addresses the issue of authority presented here.[26] It is hardly surprising that the issue has arisen so rarely, since parties and their counsel who consent to a trial before a Magistrate for the purpose of obtaining a speedier disposition of the case are unlikely to be motivated to engage in the kind of delay to which § 1927 is directed. That does not mean the power is unnecessary in the cases, such as the present, where such behavior occurs. Even before the enactment of § 636(c), it was recognized that "[i]f Magistrates are to be effective judicial officers they must have the power to complete the judicial role their position requires." *Gelfgren v. Republic Nat'l Life Ins. Co.*, 451 F.Supp. 1229, 1230 (C.D.Cal. 1978). That is still true.

ney's fees under § 1927," citing *Matter of Richardson*, 52 B.R. 527 (W.D.Mo.1985) (Resp.Mem. at 22). *Richardson* held only that Bankruptcy Courts are not Article III courts, and assumed without discussion that § 1927 sanctions may be imposed only by a "court of the United States." 52 Bankr. at 531. Whatever the wisdom of that assumption, it is no longer the law even in the Eighth Circuit after *In re Arkansas Communities, Inc.*, 827 F.2d 1219 (8th Cir. 1987), which expressly held that Bankruptcy Judges have power to impose sanctions under § 1927.

**25.** *See* S.Rep. No. 96–74, reproduced in 1979 U.S.Code Cong. & Admin.News 1469, at 1–2, 4. The legislative purpose is discussed in greater detail in the Ninth Circuit's en banc decision upholding the constitutionality of § 636(c), *Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 547 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984), cited with approval in *Collins v. Foreman*, 729 F.2d 108, 117 (2d Cir.), *cert. denied*, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984), which reached the same result on slightly different grounds.

### III. *Appropriate Sanction Under § 1927*

■ An appropriate sanction must be framed in accordance with the deterrent purpose of § 1927, discussed above, Part I. A party who incurs expense by virtue of an attorney's violation may be reimbursed only for the "excess costs" incurred as a result of the violation, not for the ordinary costs of litigation. *Roadway Express, Inc. v. Piper*, 447 U.S. at 758–59, 100 S.Ct. at 2459–60. The court is not required to award the full amount of the excess expenses. *Cf. Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir.), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987) ("*Eastway II*") (attorney's fee award under Rule 11 may be limited to amount "thought reasonable to serve the sanctioning purpose of the rule" as long as it does not fall below "bottom range of discretion"); *see also Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co.*, 112 F.R.D. 355, 357 (S.D.N.Y.1986) ("adequate *deterrence* may permissibly fall short of full *compensation*") (emphasis in original). An appropriate sanction should also take into account the waste of judicial time and resources occasioned by the violation.

**26.** *See Ullmann v. Olwine, Connelly, Chase, O'Donnell & Weyher*, 123 F.R.D. 253, 262 (motion granted), 123 F.R.D. 559 (amount awarded) (S.D.Ohio 1987), *aff'd*, 857 F.2d 1475 (6th Cir. 1988) (table), *cert. denied*, 489 U.S. 1080, 109 S.Ct. 1533, 103 L.Ed.2d 838 (1989) (§ 636(c)); *Hachikian v. Aslanian*, 114 Lab.Cas. (CCH) ¶ 11,889, 1990 WL 4733 (E.D.N.Y.1990) (§ 636(c); motion denied); *In re RBA, Inc.*, 60 B.R. 953, 958, 961–63 (D.Minn.1986), *aff'd in part and rev'd in part sub nom. In re Stauffer Seeds, Inc.*, 817 F.2d 47 (8th Cir.1987) (§ 636(c); motion denied; sanctions awarded pursuant to Rule 37, Fed.R.Civ.P.); *see also Connare v. American Postal Workers Union*, 1989 WL 158353 (W.D. N.Y.1989) (affirming Magistrate's unreported decisions denying § 1927 sanctions in § 636(c) case); *Manville Sales Corp. v. Paramount Systems, Inc.*, 1988 WL 3855, 1988 U.S.Dist. LEXIS 705 (E.D.Pa. Jan. 20, 1988) (§ 636(b)(1)(A); § 1927 sanctions imposed by Magistrate *sua sponte*): *Petroleum, Ins. Agency, Inc. v. Hartford Acc. & Indem. Co.*, 106 F.R.D. 59, 68–69 (D.Mass. 1985) (Magistrate sitting as Special Master pursuant to § 636(b)(2); § 1927 *held*, in applicable because of absence of bad faith).

**A.** *Reimbursement of Petitioner's Expenses*

█ Petitioner submitted an affidavit of its trial counsel stating that $6,414.50 in attorneys' fees was incurred "in defending against Respondents' jurisdictional challenge," consisting of work done by a partner and two associates whose hourly billing rates in 1989 were $250, $130 and $105 per hour, respectively. Relevant portions of counsel's contemporaneous time sheets are attached to the application. While the documents attached to the application are in technical compliance with the requirements of *New York Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1147–48, 1154 (2d Cir.1983), in that they "specify, for each attorney, the date, the hours expended, and the nature of the work done," they are not adequate to support a finding that all of the time claimed was expended in opposition to respondents' challenge to diversity jurisdiction. Mr. Mandelsberg's testimony at the sanctions hearing—testimony which would not have been necessary had the contemporaneous records been more informative—clears up some of the confusion on this issue, but is nevertheless an estimate. It was precisely to eliminate fee awards based on time-consuming estimates that the Court of Appeals announced the contemporaneous documentation requirement, *see* 711 F.2d at 1147–48. Nor is the application of that rule in this case a technicality, for Mr. Mandelsberg's estimate apparently fails to distinguish research on diversity jurisdiction from work done to advance petitioner's groundless theories of alternative bases of jurisdiction.

Petitioner's fee application is also deficient in factual support for the hourly rates claimed. The affidavit describes petitioner's law firm as "uniquely qualified," and states in conclusory terms that the billing rates of the attorneys involved "are commensurate with those charged by comparable firms in New York City and reflective of the skill and experience of the counsel involved." There is, however, no information in the record concerning how long any of the three attorneys has been practicing law. It is difficult to determine whether an attorney's hourly rate is comparable to the prevailing rate in the area for counsel of similar experience without knowing in what year the attorney was admitted to the Bar. There is likewise no evidence in the record tending to show what the comparable prevailing rates in New York City actually are.[27]

At the sanctions hearing, much time was expended on the issue whether Novelty had in fact paid its attorneys at the rate billed. Respondents' attorney moved to enforce a subpoena he had attempted to serve on Novelty calling for cancelled checks and related materials. Decision on that and certain related motions was reserved (hg. tr. 242–249). All such motions are denied. The evidence sought by the subpoena is irrelevant to the issue of the amount of the appropriate sanction, which depends not on what was actually paid, but on what is a reasonable amount in the circumstances, based on the time reasonably spent and the prevailing rate in the area for attorneys of comparable skill, experience and reputation. *Cf. Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (42 U.S.C. § 1988); *see also Wells v. Bowen,* 855 F.2d 37, 43 (2d Cir.1988) (Social Security Act); *Miele v. New York State Teamsters Conference Pension & Retirement Fund,* 831 F.2d 407, 408–09 (2d Cir. 1987) (ERISA). The Court of Appeals for the Second Circuit has used the method of computation of attorneys' fees under fee-shifting statutes such as § 1988 as the starting point for determining a reasonable attorneys' fee in a sanctions case, although the actual sanction may be substantially lower than the "lodestar" amount. *Eastway II,* 821 F.2d at 122–23.

█ To determine whether the time spent by Novelty's attorneys was "reasonably necessary" to oppose the motion, it is necessary to examine "to what extent [petitioner's] expenses and fees could have been avoided and were self-imposed." *INVST Financial Group, Inc. v. Chem–Nuclear*

**27.** For an example of the complexities involved in determining what is "comparable," *see Harb*

*v. Gallagher,* 131 F.R.D. 381, 386 n. 5 (S.D.N.Y. 1990).

*Systems, Inc.,* 815 F.2d 391, 404 (6th Cir.), *cert. denied,* 484 U.S. 927, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987). A good deal of the time for which reimbursement is sought must be excluded on that basis, such as the time consumed by petitioner's specious arguments that jurisdiction could be founded on Rule 69(a), Fed.R.Civ.P., or on the Federal Arbitration Act, 9 U.S.C. § 9, as well as a certain amount of "overkill" on the part of petitioner's counsel in opposing the motion (*see, e.g.,* tr. 249; 280–84; 504–568). It is not appropriate to pass these expenses on to respondents' attorney. *Cf. Boe v. Colello,* 447 F.Supp. 607, 610 (S.D.N.Y. 1978) (Weinfeld, J.); *see also Aetna Cas. & Sur. Co. v. Fernandez,* 830 F.2d 952, 956–57 (8th Cir.1987); *Grant v. Pfizer, Inc.,* 683 F.Supp. 41, 45 (S.D.N.Y.1988).

■ Attorneys' resources are also a relevant consideration in calculating the amount of monetary sanctions. *Greenberg v. Hilton Int'l Co.,* 870 F.2d 926, 939 (2d Cir.1989). Here, as in *Humphrey v. Columbia Records,* 124 F.R.D. 564, 570 (S.D.N.Y.1989), it is appropriate to take into account that respondents' attorney is a member of a small firm, on whom the effect of a substantial award might well be out of proportion to the misconduct.

■ Most of the out-of-pocket expenses claimed by petitioner's counsel are in the nature of general overhead, not shown to be directly caused by the violation of § 1927, and therefore not reimbursable. The cost of the portion of the trial transcript which petitioner's counsel needed to prepare his fee application, *cf. Harb v. Gallagher,* 131 F.R.D. at 389, would normally be reimbursable at least in part if adequately documented.[28] Here, however, petitioner's counsel alleges only that $865.06 was incurred "inclusive of" the cost of the transcript (Mandelsberg Aff. ¶ 10). No reporter's bill is attached and the exact amount is nowhere stated. On this record, therefore, the documentation of the

cost of the transcript is inadequate to warrant its award as a sanction.

■ This does not appear to be an appropriate case for an award of the expenses incurred in connection with the fee application itself. The amount claimed in connection with the sanctions proceeding is substantially in excess of the amount claimed in opposing respondents' motion to dismiss. In light of the deficiencies in the form and content of petitioner's application already noted, the piling of fees upon fees is not warranted in this case.

In the circumstances, in the exercise of discretion, an award of $2,000 in attorneys' fees is appropriate.

### B. *Sanction Payable to the Court*

■ As in most cases of dilatory or otherwise improper conduct, the burden in this case falls as much on the court—and therefore on the taxpayers—as on the parties. Based on the transcript of the trial, as well as my own familiarity with what occurred, it appears that the evidentiary hearing and oral argument on the motion to dismiss consumed the equivalent of two full court days. While § 1927 does not authorize a sanction in the nature of a share of the court's overhead, *see Blue v. U.S. Dep't of Army,* 914 F.2d 525, 548 (4th Cir.1990), an order directing nominal reimbursement of the cost to the government is appropriate. *See, e.g., Unique Concepts,* 115 F.R.D. at 294 (§ 1927; $250); *Warshay,* 750 F.Supp. at 640 (Rule 11; $500); *Manville Sales Corp.,* 1988 WL 3855 at *4 (§ 1927; $500). A sanction in the amount of $250, payable to the Clerk of Court, is consistent with these precedents.

### IV. *Alternative Basis for Sanctions Under Rule 11.*

■ Rule 11 provides an alternative basis for the imposition of sanctions in this case. Although both the motion to amend the Consent Pretrial Order and the motion to dismiss were made orally during trial,

---

**28.** *Unique Concepts Inc. v. Brown,* 115 F.R.D. 292 (S.D.N.Y.1987), cited by petitioner as authority for reimbursement of the full cost of the transcript is not in point, since the misconduct occurred during a deposition and counsel would normally have needed to order the deposition transcript in any event.

respondents' counsel filed an affidavit in support of those motions to which Rule 11 applies. *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* — U.S. ——, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991). Pursuant to Rule 11, counsel's signature on that affidavit constituted a certificate that "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry ... [the affidavit was] well grounded in fact ... [and] not interposed for any improper purpose, such as ... to cause unnecessary delay." The facts showing absence of any reasonable inquiry on counsel's part or any basis in fact for the assertions on which respondents' challenge to jurisdiction were based are set out in detail in Part I, above, and need not be repeated here. Since the statements of fact in counsel's affidavit do not differ materially from the offer of proof made in open court, the findings in Part I are equally applicable. So too is the finding of dilatory purpose, since the affidavit was one step in a chain of related events with no other discernible purpose except to delay the collection of a judgment. In the circumstances of this case, including the expenses incurred by the adverse party, a sanction in the total amount of $2,250 appears to be well within the permissible range of discretion under Rule 11 in accordance with the teaching of *Eastway II.*

### CONCLUSION

Respondents' attorney is directed to pay, within 30 days of the date of entry of this Order, (1) to Novelty Textiles, Inc., the sum of $2,000, for reimbursement of attorneys' fees incurred in opposition to respondents' motion to dismiss for lack of jurisdiction and (2) to the Clerk of the Court, the sum of $250.

IT IS SO ORDERED.